United States Court of Appeals,

Eleventh Circuit.

No. 97-4143.

UNITED STATES of America, Plaintiff-Appellee,

v.

John BIRO, Steve Alon a.k.a. Shabtai Alon, et al., Defendants-Appellants.

June 17, 1998.

Appeals from the United States District Court for the Southern District of Florida. (No. 95-917-CR-KMM), K. Michael Moore, Judge.

Before EDMONDSON and BARKETT, Circuit Judges, and ALARCÓN[*], Senior Circuit Judge.

ALARCÓN, Senior Circuit Judge:

Steve Alon, Eliezer Arce, John Biro, and John Demeter appeal from the judgment of conviction entered following their jury trial. Alon and Arce were convicted of conspiring to send electronic surreptitious surveillance devices ("ESIDs") through the mail, or in interstate or foreign commerce, in violation of 18 U.S.C. § 2512(1)(a), to possess or sell ESIDs, in violation of 18 U.S.C. § 2512(1)(b), and to smuggle merchandise into the United States in violation of 18 U.S.C. § 545. Alon and Arce were also convicted of the substantive offenses prohibited by § 2512(1)(a) and (1)(b). Biro was convicted of violating § 2512(1)(b). Demeter was convicted of conspiracy to violate §§ 2512(1)(a), 2512(1)(b), and 545; violation of the substantive crimes proscribed in those sections; and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(2).

---

[*]The Honorable Arthur L. Alarcón, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

We affirm each of the judgments of conviction. We hold that § 2512 is not unconstitutionally vague. We vacate the order that Demeter be deported as a condition of his supervised release.

I

To meet its burden of persuading the jury that the defendants were guilty of the offenses charged in the indictment, the prosecution presented evidence that they participated in a conspiracy to smuggle ESIDs into the United States for the purpose of sending them through the mail or selling these devices to others.

In late 1993, the United States Customs Exodus Group initiated an investigation after receiving information that ESIDs were being illegally imported from Japan and sold in the United

2

States in violation of 18 U.S.C. §§ 2512(1)(a) and (b)[1] and 18 U.S.C. § 545.[2]  The investigation

included Spy Shops International, Inc. ("Spy Shops"), a business owned and operated by Demeter.

---

[1]Section 2512(1)(a) and (b) read as follows:

> (1) Except as otherwise specifically provided in this chapter, any person who intentionally—
>
> (a) sends through the mail, or sends or carries in interstate or foreign commerce, any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications;
>
> (b) manufactures, assembles, possesses, or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce;  ...
>
> shall be fined under this title or imprisoned not more than five years, or both.

[2]Section 545 reads in pertinent part as follows:

> Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or
>
> Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—
>
> Shall be fined under this title or imprisoned not more than five years, or both.

Spy Shops specialized in the sale of security equipment and a variety of electronic devices. Spy Shops operated retail stores in three locations in South Florida.

Arce was the general manager of Spy Shops, responsible for overseeing all of the stores. Along with Demeter, Arce was responsible for purchasing inventory. The sales personnel reported to Demeter and Arce, and were required to get either Demeter or Arce's approval before selling an ESID. Demeter and Arce told the sales personnel to identify the sale of ESIDs as "security equipment" on written receipts. Moreover, Arce trained at least one salesperson regarding the sale of ESIDs.

During the course of their investigation, Customs agents received information that Ken Taguchi, representing Micro Electronics, a Japanese company, was a major supplier of ESIDs in the United States. Taguchi was arrested for smuggling illegal bugging and wire tapping devices into the United States. Pursuant to a plea agreement, Taguchi agreed to cooperate in the investigation of Spy Shops and Alon. Alon was the owner and operator of G.E.S. Electronics ("GES"), an electronics company that sold consumer electronic parts and ESIDs.

Taguchi provided United States Customs agents with Micro's business correspondence with Demeter. Taguchi began shipping ESIDs to Demeter from Japan in 1986 or 1987. Some of the ESIDs were disguised as three-prong wall plugs, pens, and pocket calculators. Initially, the packages identified Micro as the shipper and Spy Shops as the addressee. Later, Demeter instructed Taguchi to ship the ESIDs to PGF, another corporation controlled by Demeter, and to use the name Seibu, a Tokyo department store, as the shipper, in order to conceal the true identity of the buyer and seller. Demeter also requested that the ESIDs not be packaged in display boxes. In addition,

4

Demeter directed Taguchi to misrepresent the value of the contents of packages sent to him by Micro.

On April 6, 1995, Customs inspectors at the Los Angeles International Airport discovered that two packages shipped by Micro to GES contained ESIDs disguised as pens. Additionally, Taguchi provided Customs agents with Micro's correspondence concerning its business transactions with GES commencing in 1989. These records reflect that Alon purchased approximately 100 ESIDs disguised as pens from Taguchi.

Pursuant to a search warrant issued on April 17, 1995, Customs agents seized ESIDs disguised as pens from GES. The officers also found invoices reflecting sales to Spy Shops of ESIDs disguised as pens and calculators as well as several checks issued by Spy Shops to GES. Also seized pursuant to the search warrant was a catalog of electronic items offered for sale by GES. The catalog listed ESIDs disguised as pens, calculators, and wall plugs. In searching GES's office, the Customs agents did not find any purchase orders from law enforcement agencies or any documents authorizing GES to export ESIDs to other countries.

To demonstrate that Spy Shops possessed and sold ESIDs that had been sent through the mail or transported in interstate or foreign commerce, the Government presented the testimony of two Customs agents who made undercover purchases of ESIDs. United States Customs Special Agent Gary Lang went to the Spy Shops Fort Lauderdale store. He falsely identified himself to Biro, the manager of the store, as Garrison Luhr, a businessman who wanted an ESID to eavesdrop on the conversations of a competitor in order to underbid him.

Biro showed Agent Lang a catalog containing various devices including ESIDs disguised as pens, calculators, and a three-prong wall plug. Biro also showed Agent Lang several ESIDs,

5

which were retrieved from a back room. While showing Agent Lang the ESIDs, Biro told him that he must sign a waiver if he wanted to purchase any of the devices. Biro gave Agent Lang the waiver to review. It stated that the devices were being bought for export only and would not be used in the United States. Shortly after Agent Lang inquired about the distance range of the ESID disguised as a three-prong wall plug, Biro asked Agent Lang for a business card and identification. He compared the two to ensure that they matched. Biro then took Agent Lang into an adjoining room behind the display area and closed the door. Biro demonstrated several ESIDs, including a pen. Biro did not touch the ESIDs with his fingers, but instead handled them with a piece of paper.

Agent Lang purchased a scrambler designed to alter telephone conversations and an ESID disguised as a three-prong wall plug. Because Biro did not have a three-prong wall plug available for immediate sale, he asked Agent Lang to return the following day. Agent Lang gave Biro a deposit for the purchase of the ESID and asked for a receipt. Biro refused to give him a receipt.

Agent Lang returned the following day and gave Biro the balance due on the ESID. Agent Lang also executed the waiver. As he signed the waiver, however, he stated to Biro, "you know I'm not taking it out of here. I just, I want to, I'm going to make money." Biro responded "[r]ight, don't worry about it," and completed the sale. Biro refused to give Agent Lang a copy of the waiver, but he did give Agent Lang a receipt listing only the scrambler, which Agent Lang had purchased the previous day. When Agent Lang mentioned needing another ESID for a friend, Biro told him not to call and discuss it over the phone but instead to come in and see him.

On March 29, 1995, United States Special Agent Arkadis Karb went to the Spy Shops store at 350 Biscayne Boulevard in Miami. He posed as a European with a Russian accent. Agent Karb explained to a female salesperson that he wanted to purchase a device to record conversations

surreptitiously. None of the ESIDs were on display in the public portion of the store. The salesperson produced two metal attache cases from behind the counter. They contained ESIDs disguised as pens and calculators. Agent Karb did not purchase an ESID on his first visit to the Spy Shops store because they were too expensive.

He returned the following day and informed the salesperson that he wanted to purchase an ESID. Agent Karb inquired whether the devices would record conversations transmitted on American telephone instruments. He was assured that the ESIDs would do so and was given a demonstration of its effectiveness on a telephone in the store.

Agent Karb was informed that he would have to produce proof of his identification. Agent Karb refused to do so. After the salesperson spoke to Demeter, Agent Karb was told that he would not have to present any identification. The salesperson informed Agent Karb that the use of ESIDs in the United States was illegal. Agent Karb was not asked how he intended to use the ESID. He was not given a receipt for his purchase nor was he requested to sign a waiver form. He did not receive any export documents.

Section 2512(2)(a) provides that it is not unlawful for a provider of wire or electronic communications service, or a person under contract with a provider of such services, to send through the mail or carry an ESID in interstate or foreign commerce, or to possess or sell such a device. Section 2512(2)(b) provides that it is not unlawful for an officer of the United States, or of a state or local agency, or a person under contract with a governmental agency to send through the mail, or carry an ESID in interstate or foreign commerce, or to possess or sell such a device.[3] It is also

---

[3]Sections 2512(2)(a) and (b) read as follows:

    (2) It shall not be unlawful under this section for-

7

lawful for these same classifications of persons and businesses to export ESIDs if they possess a license.[4]

Customs agents searched the offices of both GES and Spy Shops pursuant to a search warrant. They did not find any government contracts or purchase orders for ESIDs, or Department

---

(a) a provider of wire or electronic communication service or an officer, agent, or employee of, or a person under contract with, such a provider, in the normal course of the business of providing that wire or electronic communication service, or

(b) an officer, agent, or employee of, or a person under contract with, the United States, a State, or a political subdivision thereof, in the normal course of the activities of the United States, a State, or, a political subdivision thereof.

to send through the mail, send or carry in interstate or foreign commerce, or manufacture, assemble, possess, or sell any electronic, mechanical, or other device knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications.

[4]In 1996, 15 C.F.R. § 776.13(a) provided in relevant part as follows:

(a) Export license requirements. A validated export license is required for the export to any destination (including Canada) of any electronic, mechanical or other device primarily useful for surreptitious interception of wire or oral communications. Any exporter who knows, or has reason to believe, that such commodities will be used for such purpose shall include that information on his export application....

(b) Qualifications of exporter. Licenses to export the commodities described in paragraph (a) of this section will be issued only to:

(1) A provider of wire or electronic communization service or an officer, agent, or employee of, or person under contract with, such a provider in the normal course of the business of providing that wire or electronic communication service; or

(2) Officers, agents, or employees of, or person under contract with the United States, one of the 50 states, or a political subdivision thereof, when engaged in the normal course of government activities.

8

of Commerce export licenses. No evidence was introduced by any of the Appellants that they were authorized to mail, send through interstate commerce, possess, or sell ESIDs because they had a contract to do so with a provider of electronic communication services,[5] a governmental agency, or that they had been granted an export license.

## II

Appellants present two arguments that warrant discussion.[6] First, Appellants contend that 18 U.S.C. § 2512 is unconstitutionally vague as applied to them. This is an issue of first impression in this circuit.[7] Second, Demeter contends that the district court lacked the jurisdiction to order his

---

[5]The term "electronic communication service" is defined by Congress as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). The legislative history of the Electronic Communications Privacy Act of 1986 explains that "[e]xisting telephone companies and electronic mail companies are providers of electronic communications services." Electronic Communications Privacy Act of 1986, S.Rep. No. 99-541, at 14 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3568.

[6]In addition to these issues, the Appellants assert several other arguments that can be disposed of summarily because they have no merit. Arce asserts that the evidence is insufficient to support his conviction. Alon makes the same argument regarding his conviction for conspiracy. The evidence summarized in Part I of this opinion is sufficient to persuade a rational jury of their guilt beyond a reasonable doubt. See *Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979).

Arce and Biro assert that the court erred in denying their motions for severance. Arce, Alon, and Demeter maintain that the district court erred in admitting evidence that the sale of ESIDs violated various administrative regulations. Demeter argues that the district court denied him the effective assistance of counsel by limiting argument to twenty minutes. Demeter and Alon also claim that the district court erred in overruling the defendants' objections to the prosecutor's comments to the jury during argument. We reject each of the contentions set forth in this footnote as meritless and affirm the district court's rulings pursuant to Eleventh Circuit Rule 36-1.

[7]Judicial review of § 2512 has been remarkably scarce. The Ninth Circuit is the only circuit that has published an opinion addressing a vagueness challenge to § 2512. While the court concluded that § 2512 is not unconstitutionally vague, the court did not explain the basis for its conclusion. *United States v. Novel,* 444 F.2d 114 (9th Cir.1971).

deportation as a condition of supervised release. We must consider this contention notwithstanding the fact that it was not raised before the district court.

## A. Vagueness

Appellants contend that 18 U.S.C. § 2512 is unconstitutionally vague as applied to them. They argue that the words "knowing, or having reason to know that the design of [any electronic, mechanical, or other] device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications" fail to give adequate notice to the public of the prohibited conduct and do not contain sufficient guidelines to prevent arbitrary and discriminatory law enforcement.

We are required to review *de novo* the question whether a statute is void for vagueness. *United States v. Paradies* 98 F.3d 1266, 1282 (11th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 2483, 138 L.Ed.2d 992 (1997).

Appellants concede that the § 2512 does not implicate the First Amendment or any other constitutionally protected conduct. They agree that we need not consider whether the statute is overbroad in its reach, but only whether the statute is vague as applied to them.

The Supreme Court has instructed that:

> the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.

10

*Kolender v. Lawson,* 461 U.S. 352, 357-58, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations and internal quotations omitted).

While the Court has instructed that preventing discriminatory law enforcement is the more important aspect of the vagueness doctrine, we must nevertheless first address actual notice. In determining whether a statute provides actual notice, we must decide whether an ordinary person could "reasonably understand that his contemplated conduct is proscribed." *United States v. National Dairy Prods., Corp.,* 372 U.S. 29, 32-33, 83 S.Ct. 594, 598, 9 L.Ed.2d 561 (1963).

Appellants contend that § 2512 does not provide ordinary persons with clear standards regarding the conduct Congress intended to prohibit. Relying on *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("*Flipside* ") and *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994) ("*Posters 'N' Things*"), they argue that the failure of the statute to include examples of the specific types of devices that are "primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications" violates the requirement that criminal statutes provide notice of what is forbidden. Appellant's reliance on *Flipside* and *Posters 'N' Things* is misplaced. In those cases, the Court upheld the constitutionality of the ordinances, even though the challenged language did not clearly describe the nature or properties of the prohibited items. In the instant matter, the statutory language expressly describes the nature of the prohibited items: the statute proscribes devices primarily designed to function as surreptitious transmitters of communications.

In *Flipside,* the Supreme Court reviewed a void-for-vagueness constitutional challenge to a local ordinance. The district court declined to grant injunctive relief. *Flipside,* 455 U.S. at 493, 102 S.Ct. at 1190-91. The Seventh Circuit reversed the judgment holding that the ordinance was

11

unconstitutionally vague on its face. *Flipside, Hoffman Estates, Inc. v. Village of Hoffman Estates,* 639 F.2d 373, 386 (7th Cir.1981). "The ordinance [made] it unlawful for any person "to sell any items, effect, paraphernalia, accessory or thing which is designed or marketed for use with illegal cannabis or drugs, as defined by Illinois Revised Statutes, without obtaining a license therefor.' " *Flipside,* 455 U.S. at 492, 102 S.Ct. at 1190. The Seventh Circuit held that the words "designed or marketed for use with illegal cannabis or drugs" provided no guidance as to the nature or properties of the items prohibited for sale without a license. *Flipside,* 639 F.2d at 380-82. The court pointed out that the ordinance's language was ambiguous enough to include ordinary pipes and paper clips. *Id.* at 382 & n. 22.

The Supreme Court reversed the decision of the Seventh Circuit. The Court first noted that "the words, "items, effect, paraphernalia, accessory, or thing' do not identify *the type of merchandise* that the village desires to regulate." *Flipside,* 455 U.S. at 500, 102 S.Ct. at 1194 (emphasis added). The Court concluded, however, that the words "designed for use," when read in conjunction with the licensing guidelines prepared by the village attorney, clearly refer to the "structural characteristics of an item" designed or marketed for use with illegal cannabis or drugs. *Id.* at 501, 102 S.Ct. at 1195. One item regulated under the guidelines and sold by *Flipside* was a "roach clip." The Court explained that "the standard [designed for use] encompasses at least an item that is principally used with illegal drugs by virtue of its objective features, i.e., features designed by the manufacturer." *Id.* The village chief of police testified that "he had never seen a "roach clip' used for any purpose other than to smoke cannabis." *Id.* at 502, 102 S.Ct. at 1195. The Court held that the ordinance was "reasonably clear in its application to the complainant." *Id.* at 505, 102 S.Ct. at 1196.

In *Posters 'N' Things*, the petitioners challenged the Mail Order Drug Paraphernalia Control Act. Section 857(a) of that statute provides:

It is unlawful for any person—

(1) to make use of the services of the Postal Service or other interstate conveyance as part of a scheme to sell drug paraphernalia;

(2) to offer for sale and transportation in interstate or foreign commerce drug paraphernalia; or

(3) to import or export drug paraphernalia.

21 U.S.C. § 857(a).

The petitioners in *Posters 'N' Things* asserted before the Supreme Court that § 857 was unconstitutionally vague as applied to them. *Posters 'N' Things*, 511 U.S. at 525, 114 S.Ct. at 1754. The Court rejected this contention. The Court pointed out that in § 857(d), the statute includes a list of items constituting *per se* drug paraphernalia including roach clips and pipes designed for use with illegal drugs like those found in the petitioners' possession. *Id.* at 525-26, 114 S.Ct. at 1754-55. The Court also noted that in § 857(e), the statute "sets forth objective criteria for assessing whether items constitute drug paraphernalia." *Id.* at 526, 114 S.Ct. at 1754. The Court held that § 857 was not unconstitutionally vague as applied to the petitioners. *Id.* at 525, 114 S.Ct. at 1754.

In this matter, the objective characteristics of the pens, wall plugs, and calculators containing concealed transmitters come within the statutory prohibition regarding items that are "primarily useful for the purpose of the surreptitious interception" of oral communications.

Alon maintains that there is no indication in the statute that " "primarily useful' refers to the objective design of the product, as opposed to the subjective intent of the user." (Alon's Br. at 24.) In *Flipside,* the Supreme Court rejected a similar argument.

The Court of Appeals objected that "designed ... for use" is ambiguous with respect to whether items must be inherently suited only for drug use; whether the retailer's intent or manner of display is relevant; and whether the intent of a third party, the manufacturer, is critical, since the manufacturer is the "designer." 639 F.2d, at 380-381. For the reasons that follow, we conclude that this language is not unconstitutionally vague on its face.

The Court of Appeals' speculation about the meaning of "design" is largely unfounded. The guidelines refer to "paper of colorful design" and to other specific items as conclusively "designed" or not "designed" for illegal use. A principal meaning of "design" is "[t]o fashion according to a plan." Webster's New International Dictionary of the English Language 707 (2d ed.1957). Cf. *Lanzetta v. New Jersey,* 306 U.S. 451, 454, n. 3, 59 S.Ct. 618, 619 n. 3, 83 L.Ed. 888 (1939). It is therefore plain that the standard encompasses at least an item that is principally used with illegal drugs by virtue of its objective features, *i.e.,* features designed by the manufacturer. A business person of ordinary intelligence would understand that this term refers to the design of the manufacturer, not the intent of the retailer or customer.

*Flipside,* 455 U.S. at 500-01, 102 S.Ct. at 1194-95 (footnote omitted). Additionally, this court has held that "the phrase "designed for use' refers to structural features of objects ... and that the intent implicated is that of the designer (i.e., patent holder or manufacturer).... [T]he designer's intent for a design is reflected by the objective physical characteristics of the finished product." *Florida Businessmen for Free Enterprise v. City of Hollywood,* 673 F.2d 1213, 1214-15 (11th Cir.1982).

The key word in § 2512 that clearly conveys the intent of Congress in proscribing the sale of communication interception devices is "surreptitious." In discussing the question whether a device that was modified by the appellants to decipher scrambled satellite television signals fell within the plain meaning of § 2512, this court stated in *United States v. Herring,* 993 F.2d 784 (11th Cir.1993) (en banc):

Although the term "surreptitious" is not defined in the statute itself, its dictionary definition is well established: secret and unauthorized; clandestine; action by stealth or secretly. It is clear that this device operates surreptitiously, that is, without authority, secretly, and clandestinely. It is clear that the device was designed to intercept satellite television signals without detection by the programmers of pay-television.

*Id.* at 786 (footnote omitted).

14

We are persuaded that an ordinary person would understand that § 2512 prohibits a vendor from selling a device to a customer designed by the manufacturer primarily for the purpose of the surreptitious interception of communications. Section 2512 prohibits a person *inter alia* from intentionally sending or selling a device "*knowing or having reason to know that the design of such device* renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communication." 18 U.S.C. 2512(1)(a) and (b) (emphasis added). The statute makes no reference to the customer's intended use of the product.

The evidence introduced at trial demonstrates beyond a reasonable doubt that the pens, calculators, wall plugs, and other devices sold by the Appellants in this matter were designed to conceal transmitters for the purpose of secretly intercepting oral communications. Moreover, the evidence and the Appellants' theory of defense demonstrate that, as applied to them, § 2512 provided adequate notice regarding which devices were prohibited by the statute. The theory of defense was essentially the same for each of the Appellants: they believed that they could legally possess and sell ESIDs to law enforcement officers, or for export, and that the Spy Shops' policy of checking identification and obtaining written disclaimers, in which customers were informed of the law, was sufficient to comply with the law. This theory of defense and the evidence in support of it are patently inconsistent with Appellants' assertion that § 2512 failed to give them notice as to what constitutes a device designed primarily to be useful for the purpose of the surreptitious interception of communications.

The evidence was sufficient to show that each Appellant had notice that the sale of ESIDs violated federal law. Demeter was responsible for purchasing the inventory. He instructed Taguchi to ship the ESIDs to PGF and to use the name "Seibu" in order to conceal the true identify of the

15

buyer and seller. Demeter also requested that the ESIDs not be packaged in display boxes and that the value of the contents of the packages be misrepresented. Moreover, Demeter established Spy Shops' policy that he and Arce had to approve the sales of ESIDs.

Arce was also responsible for purchasing inventory. Sales persons were required to obtain his approval before completing the sale of an ESID. Additionally, Arce's reply brief states that "Arce did not deny that Spy Shops sold ESIDs or that the sales were "intentional'—*i.e.,* not accidental. Rather, he argued to the jury that, as far as he knew, the sales were perfectly legal because sales of ESIDs were limited to (1) sales for export purposes only and (2) sales to law enforcement." (Arce Reply Br. at 3.)

Biro's theory of defense at trial was that he was merely a salesman selling a variety of security equipment, which happened to include ESIDs. The evidence introduced at trial clearly demonstrated, however, that Biro was aware that the device he sold to Agent Lang was proscribed by § 2512. The evidence showed that he followed company policy with respect to the sale of ESIDs. In his encounter with Agent Lang, Biro verified Lang's identification and checked with Demeter before agreeing to sell him an ESID. Biro warned Lang several times that the ESID he purchased could only be exported or used by law enforcement, and Biro required Lang to sign a waiver form in which Spy Shops disclaimed any responsibility for the customer's use of the ESID. While handling the ESID, Biro used a piece of paper so as not to leave fingerprints.

The Government introduced a Spy Shops catalog into evidence at trial. The catalog contained a photograph of an ESID disguised as a light bulb. The device was described as follows:

> By inserting this bulb you are able to install a mains powered transmitter in a flash. The operating time of the transmitter is unlimited and all conversations within the room are transmitted up to a distance of approximately 250 metres. The bulb transmitter is available for 220 V or 110 V. *The bulb cannot be used as a light source.*

16

(emphasis added).

Alon testified at trial that he was informed by his employees, who frequently researched the law in this area, that he could sell ESIDs as long as they were for law enforcement or for export. Alon also testified that Demeter told him that he exported and sold ESIDs to law enforcement; accordingly, Alon obtained a waiver from Demeter. As described by Alon, the waiver was "a disclaimer that in very large letters at the tops says "BE ADVISED OF THE LAW.' And we describe the law and the section, the chapters, the titles of everything and the penalty that will be if you do not obey the law."

If the Appellants were unclear as to what constituted an ESID, they would not have been as diligent in enacting the procedures that they mistakenly believed would shield them from liability when they sold ESIDs without a contract from a government agency or communications company.

Arce also argues that the vagueness of § 2512 is exacerbated by the fact that persons can be convicted for "having reason to know" that the design of a device renders it "primarily useful" for the purpose of the surreptitious interception of communications. Arce contends that this language allows a person to be convicted on the basis of simple negligence. This contention is unmeritorious.

This court has held that the phrase "reasonably should know" does not permit a conviction for negligent conduct. *Florida Businessmen For Free Enterprise v. City of Hollywood,* 673 F.2d 1213, 1219 (11th Cir.1982). "The "reasonably should know' standard does not punish innocent or inadvertent conduct but establishes a scienter requirement that the defendant acted in bad faith." *Id.* This court has noted that "proof that a defendant reasonably should have known something is established in substantially the same manner as actual knowledge." *Id.*

17

This court has also held that the phrase "reasonably should know" is not impermissibly vague. *Id.* This court stated that that phrase "is sufficiently certain to provide fair notice to persons of ordinary intelligence of its meaning and application." *Id.*

Our conclusion that the phrase "having reason to know" is not impermissibly vague is supported by the many criminal statutes using the phrase "reasonably should know" or "having reason to know" that have withstood constitutional attack. *See e.g., Gorin v. United States,* 312 U.S. 19, 27-28, 61 S.Ct. 429, 433-34, 85 L.Ed. 488 (1941); *Washington Mercantile Ass'n v. Williams,* 733 F.2d 687, 692 (9th Cir.1984) (holding "reasonably should know" language not unconstitutionally vague under the more rigorous standard applied where constitutionally protected commercial speech is at issue); *Camille Corp. v. Phares,* 705 F.2d 223, 230 (7th Cir.1983); *United States v. Featherston,* 461 F.2d 1119, 1121-22 (5th Cir.1972) (holding "knowing or having reason to know" is not unconstitutionally vague). Finally, we note that "the [Supreme] Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice ... that [the] conduct is proscribed." *Flipside,* 455 U.S. at 499, 102 S.Ct. at 1193.

Demeter focuses his vagueness challenge on the discriminatory law enforcement prong of the two-part vagueness test. First, Demeter argues that the vagueness of the statute is demonstrated by the fact that the officers "had to be tutored in what to look for in making undercover buys." (Demeter's Opening Br. at 53.) We believe that the necessity to brief the officers regarding the deceptive appearance of the ESIDs is persuasive evidence that the ashtrays, light bulbs, phone jacks, beepers, calculators, pens, and wall plugs containing hidden transmitters were designed primarily for use in the surreptitious interception of oral communications.

Demeter also maintains that the statute is so vague that it results in discriminatory law enforcement. Demeter points to the fact that Radio Shack has not been prosecuted for selling a transmitter it advertises as being so tiny that "[i]f you could hollow out a sugar cube, this little baby would fit with room to spare." At trial, Biro offered evidence that his trial attorney went into a Radio Shack store and requested a transmitter that he could use to listen to a business competitor's conversations. The clerk sold him a wireless transmitter for $19.99.

The vagueness doctrine requires that legislation contain minimal guidelines to govern law enforcement in order to prevent arbitrary and discriminatory law enforcement. *Kolender v. Lawson,* 461 U.S. 352, 357-58, 103 S.Ct. 1855, 1857-59, 75 L.Ed.2d 903 (1983). There is no requirement, however, that statutes define every factual situation that may arise. *Boyce Motor Lines v. United States,* 342 U.S. 337, 340-41, 72 S.Ct. 329, 330-31, 96 L.Ed. 367 (1952). "That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947).

We need not decide whether the Radio Shack device is an ESID in order to determine that § 2512 provides minimal guidelines for law enforcement. The evidence demonstrates that there were significant differences between the devices sold by Demeter, Arce, Biro, and Alon and the transmitter sold by Radio Shack. While the sale of the Radio Shack transmitter may constitute a "marginal case" under § 2512, requiring expert evidence, it is obvious from their structural characteristics that the devices sold by Spy Shops were designed to conceal a transmitter for the purpose of surreptitiously intercepting communications. No reasonable person would pay $720.00 for a wall plug that has the sole function of conducting electricity to a floor lamp. Radio Shack sold

19

a small device that can transmit oral communications. Appellants failed to present any evidence establishing that it was the intent of the designer of the Radio Shack transmitter that it be used primarily for the *surreptitious* interception of oral communications. Tiny transmitters worn on lapels or clipped to clothing are used to amplify the voices of news readers, talk show guests, actors, and singers. The distinction between the tiny Radio Shack transmitter and the devices sold by Appellants is that their hidden transmitters were disguised as everyday objects that do not transmit oral communications.

Moreover, there are legitimate reasons why law enforcement might target certain vendors of ESIDs over others. The district court in *United States v. Spy Factory, Inc.,* an analogous case in which § 2512 was challenged as unconstitutionally vague, stated as follows:

> There is a perfectly understandable reason why officers and prosecutors seek convictions of defendants like the Spy Factory and not institutions like Radio Shack and Hammacher Schlemmer: because the Spy Factory, by its very name, and in countless other ways evidenced in the Government's papers, sets itself out as a place where one might be more likely to locate devices that can be used for illegal, rather than legal purposes....Therefore, even though section 2512 might permit the prosecution of Radio Shack and Hammacher Schlemmer and other institutions selling similar devices, it is perfectly rational, and perhaps even prudent, for law enforcement officials to concentrate their efforts on the defendants who are not only most likely to be convicted, but also are most likely to serve a clientele bent on illegal practices.

*United States v. Spy Factory, Inc.,* 951 F.Supp. 450, 476-77 (S.D.N.Y.1997) (footnote omitted).

The district court's rationale in *Spy Factory* is sound. The fact that law enforcement chose to target its efforts during its sting operation on the Spy Shops, and not Radio Shack, does not demonstrate that § 2512 encourages arbitrary and discriminatory law enforcement. The district court did not err in rejecting each of Appellant's constitutional challenges.

B. The Deportation Order

The district court ordered Demeter deported as a condition of his supervised release. Demeter argues for the first time in his reply brief that the district court lacked subject matter jurisdiction to order deportation pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act, 8 U.S.C. § 1229a(a) ("IIRAIRA").[8] We address Demeter's contention because a party may raise an objection to jurisdiction at any time during the pendency of the proceedings. *United States v. Ayarza-Garcia,* 819 F.2d 1043, 1048 (11th Cir.1987).

The IIRAIRA was enacted after sentencing, but during the pendency of this appeal. It provides that "a hearing before an immigration judge is the exclusive procedure for determining whether an alien may be deported from the United States." *United States v. Romeo,* 122 F.3d 941, 942 (11th Cir.1997). In *Romeo,* we held that " § 1229a(a) eliminates any jurisdiction district courts enjoyed under [18 U.S.C. § 3583(d) ] to independently order deportation." *Id.* at 943. As a result of the enactment of § 1229a(a), " § 3583(d) authorizes a district court to order that a defendant be

---

[8]The IIRAIRA provides in relevant part as follows:

> § 1229a. Removal Proceedings
>
> (a) Proceeding
>
>> (1) In general
>>
>> An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.
>>
>> ....
>>
>> (3) Exclusive procedures
>>
>> ... [A] proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be ... removed from the United States.

surrendered to the INS for deportation proceedings in accordance with the INA, but it does not authorize a court to order a defendant deported." *Id.* at 943-44. In *Romeo,* we also held that § 1229a(a) is applicable to all pending cases. *Id.* at 944. Accordingly, we must apply § 1229a(a) in this matter.

III

We hold that § 2512 is not unconstitutionally vague as applied to Appellants. The devices they imported and sold were cleverly designed to intercept communications surreptitiously. To conceal their primary function, they were disguised as common objects such as pens, wall plugs, calculators and light bulbs that do not illuminate. Appellants actual knowledge that domestic use of ESIDs was illegal was demonstrated by the waivers they executed when selling these devices to persons who identified themselves as American businessmen wanting to eavesdrop on their competitors. The statute contains an adequate standard to guide government agents in enforcing the law by targeting only those devices primarily designed by the manufacturer to intercept communications surreptitiously.

Because § 1229a(a) became effective during the pendency of Demeter's case, we must vacate the portion of Demeter's sentence ordering his deportation as a condition of supervised release. We remand to the district court for consideration whether Demeter should be surrendered to the INS for deportation proceedings in accordance with the INA.

AFFIRMED in part, VACATED in part, and REMANDED with directions.