# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

JAE GAB KIM,
    *Defendant-Appellant.*

No. 05-50112

D.C. No.
CR-01-00024-RT

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Robert J. Timlin, Senior Judge, Presiding

Argued and Submitted
March 6, 2006—Pasadena, California

Filed April 10, 2006
Amended May 25, 2006

Before: M. Margaret McKeown and Marsha S. Berzon,
Circuit Judges, and Samuel P. King,* Senior Judge.

Opinion by Judge Berzon

---

*The Honorable Samuel P. King, Senior United States District Judge
for the District of Hawaii, sitting by designation.

**COUNSEL**

William J. Genego, Esq., Santa Monica, California, argued the case and was on the briefs for the defendant-appellant.

Gregory A. Lesser, Assistant U.S. Attorney, Los Angeles, California, argued the case and was on the briefs for the plaintiff-appellee; Debra Wong Yang, U.S. Attorney and Thomas P. O'Brien, Assistant U.S. Attorney, Los Angeles, California, were on the briefs for the plaintiff-appellee.

**ORDER**

The opinion filed on April 10, 2006, is amended as follows:

On slip opinion page 3929, line 9, beginning with "Over-the-counter sales . . ." and ending line 12 with "from 'regulated transactions.' " delete and replace with the following:

> Over-the-counter sales of pseudoephedrine that are not "ordinary," however, may be regulated transactions, because they are not necessarily included in the exemption from regulated transactions.

On slip opinion page 3929, line 12, after "exemption from 'regulated transactions.' " insert the following footnote:

> The definition of "regulated transaction" generally allows the "Attorney General [to] establish[ ] a threshold amount for a specific listed chemical." § 802(39)(A). Section 802(39)(A)(iv)(II) provided at the time of Kim's offense "the threshold for any sale of products containing pseudoephedrine . . . products by retail distributors or by distributors required to submit reports by section 830(b)(3) of this title shall be 24 grams of pseudoephedrine . . . in a single transaction."
>
> At the time of the relevant transactions in this case, the Attorney General had not established single transaction thresholds for retail sales of pseudoephedrine, but he has done so since then. *Compare* 21 C.F.R. 1310.04(f) (2000) *with* 21 C.F.R. 1310.04(f) (2006). The details of the quantity or quality of pseudoephedrine that must be recorded and reported are not dispositive in this case and the statute has been amended recently, *see* infra note 8, so we do not address the recording and reporting requirements further.

On slip opinion page 3929, line 22, beginning with "Alternatively, sales of twenty-four grams . . ." and ending line 28 with "twenty-four grams or more." delete and replace with the following:

> Additionally, sales of twenty-four grams or more of pseudoephedrine were automatically subject to the recording requirements of § 830. § 802(39)(A)(iv)(II). The upshot is that over-the-counter sales of pseudoephedrine had to be recorded if the items purchased totaled twenty-four grams or more and (1) were not in blister packs or (2) were in packages of more than three grams per package.

With these amendments, the panel has voted to deny the petition for rehearing. The petition for rehearing is DENIED. No further petitions for rehearing or for rehearing en banc may be filed.

---

## OPINION

BERZON, Circuit Judge:

Pseudoephedrine, a "listed chemical" under a federal drug statute, 21 U.S.C. § 802(33) & (34)(K), is an ingredient in many over-the-counter cold medications. It can also be used to manufacture methamphetamine, a controlled substance under 21 U.S.C. § 812. Both the United States and California have statutes prohibiting over-the-counter sales of drugs containing pseudoephedrine in certain instances. *See* 21 U.S.C. § 841(c)(2); CAL. HEALTH & SAFETY CODE § 11100(a)(17) & (e)(6).

This case concerns the conviction of the proprietor of a small pharmacy for selling cold remedies containing pseudoephedrine. Jae Gab Kim was convicted of violating 21

U.S.C. § 841(c)(2), which prohibits the distribution of listed chemicals, including pseudoephedrine, "knowing, or having reasonable cause to believe, that [the pseudoephedrine] will be used to manufacture a controlled substance." He argues that, because drugs containing pseudoephedrine can be legally sold over the counter and there is no bright line in the law demarcating a legal sale from an illegal sale, the law allowing conviction upon "reasonable cause to believe" is unconstitutionally vague. We have previously held that § 841(c)(2) contains a mens rea requirement. With that mens rea standard, the statute is not unconstitutionally vague. We therefore affirm Kim's conviction.

## I.  BACKGROUND

Kim owned and operated the San Jacinto Pharmacy. After receiving information about the law regarding the sale of pseudoephedrine from an industry newsletter, Kim instructed his clerk, Virginia Garcia, not to sell more than 150 sixty-milligram pills per person, per day. Kim believed that sales under this quantity were legal.

Kim purchased drugs containing pseudoephedrine from Bergen Brunswig. In May 2000, the Drug Enforcement Administration (DEA) received a report from Bergen Brunswig that Kim's purchases of drugs containing pseudoephedrine had sharply increased.[1]

The DEA began an investigation of Kim, sending undercover agents to purchase cold remedies containing pseudoephedrine from his pharmacy. Two transactions are relevant to this appeal:[2] On January 4, 2001, three undercover

---

[1] Evidence at trial showed that Kim's purchases increased from a total of 347.28 grams in December 1999 to 1712.16 grams in April 2000. The quantity continued to increase, reaching a high of 4396.32 grams in July 2000. Kim's purchases of the larger-count bottles (stock bottles) also increased drastically over the same time period.

[2] There were seven total purchases by undercover agents, each one eventually resulting in a count in Kim's indictment. As noted below, Kim was ultimately convicted of only two counts in the indictment.

agents entered Kim's pharmacy. Kim was standing in an elevated section at the rear of the pharmacy, filling prescriptions. Kim nodded and smiled at the three agents. The agents attempted to purchase all the packages of cold medication on display. After Garcia started to tell the agents that one person could not buy all the medication, Kim interjected to ask what was going on and who was buying what. Kim instructed them to return some of the medication so that his stock would not be depleted. The three agents returned some of the boxes and divided the remainder for purchase. Ultimately, the agents were each allowed to purchase two boxes of 96-count thirty-milligram tablets and one box of 24-count thirty-milligram tablets, for a total of around 6 grams of pseudoephedrine. Additionally, in Kim's presence and conspicuously, the men inquired about and purchased hydrogen peroxide, iodine, and rubbing alcohol, all of which are used to manufacture methamphetamine. One of the men mumbled, in connection with the purchase of alcohol, that he needed alcohol to "break it down." One of the agents provided all the money for the purchases, although the purchases were rung up separately. There were confusing statements as to whether the person who supplied the money was holding the others' money for them or, instead, paying for all the purchases himself.

As Garcia was completing the transaction, one of the agents asked, "Can we get some more of this tomorrow?" Garcia answered, "Well hopefully." Kim, however, answered, "We're not selling every day." He added that the purchase "lasts for you, normally."

The next day, January 5, 2001, the same three undercover officers returned to the pharmacy. Kim again nodded to them as they entered. Although the officers assumed that he recognized them, there is no direct evidence that he did. One officer attempted to purchase multiple bottles of pseudoephedrine. Again, Garcia would not allow this sale to proceed. She did, however, allow each man to purchase one 100-count sixty-milligram bottle. As on the previous day, one officer held all

the money initially and handed it to the other two so they could pay for their pseudoephedrine. Afterwards, the officers also each purchased two 24-count boxes of thirty-milligram pseudoephedrine, for a total of about 7.5 grams each. Kim was not involved in this transaction, but he was in the store at the time.

Kim was indicted for violating 21 U.S.C. § 841(c)(2),[3] for distributing a listed chemical when the merchant "knows or has reasonable cause to believe" that the chemical will be used to manufacture illicit drugs.[4] At trial, at the close of the government's case-in-chief, the district court granted Kim's motion for judgment of acquittal on three counts. The jury found Kim not guilty of another count. The district court later granted a post-verdict judgment of acquittal as to yet another count. In the end, Kim was convicted only on counts six and seven, covering the incidents described above.

Both after the government's case-in-chief and after the jury returned its verdict, Kim challenged the vagueness of the statute under which he was indicted. The district court denied both motions. Kim was sentenced to five months incarceration, three years supervised release—during which he was to spend five months in home detention—and a $15,000 fine. We were informed at oral argument that he lost his pharmacist's license as a result of the convictions.

---

[3]Unless otherwise noted, all references to the United States Code and California Health and Safety Code are to the 2000 version.

[4]Kim's case previously came before the Ninth Circuit on appeal from the dismissal of the indictment. *United States v. Kim*, 298 F.3d 746 (9th Cir. 2002). Kim complained that his indictment could not stand because it failed to allege that he knew that the pseudoephedrine he sold "would be used to manufacture a drug outside the scope of his authority as a licensed pharmacist." *Id*. at 748. The district court agreed and dismissed Kim's indictment. The government appealed. *Id*. We reversed the district court, determining that the elements of the crime were sufficiently set forth to overcome a motion to dismiss. *Id*. at 750.

## II.  **STATE AND FEDERAL LAW**

**[1]** The federal statute under which Kim was convicted provides that "[a]ny person who knowingly or intentionally . . . possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance except as authorized by this subchapter" shall be fined or imprisoned, or both. 21 U.S.C. § 841(c)(2). The federal law also contains a requirement that sales of certain packages of pseudoephedrine be recorded.[5] The recording statute contains a confusing maze of rules, exceptions to the rules, and exceptions to the exceptions. First, "[e]ach regulated person who engages in a regulated transaction involving a listed chemical . . . shall keep a record of the transaction for two years after the date of the transaction." 21 U.S.C. § 830(a)(1). Not all sales of listed chemicals, however, are considered "regulated transactions." "[A]ny sale of ordinary over-the-counter pseudoephedrine . . . by retail distributors shall not be a regulated transaction." § 802(39)(A)(iv)(I)(aa). Over-the-counter sales of pseudoephedrine that are not "ordinary," however, may be regulated transactions, because they are not necessarily included in the exemption from regulated transactions.[6] With respect to pseudoephedrine in particular,

---

[5]Certain of those sales that must be recorded must also be *reported* to the government.

> Each regulated person shall report to the Attorney General . . .
> any regulated transaction involving an extraordinary quantity of
> a listed chemical, an uncommon method of payment or delivery,
> or any other circumstance that the regulated person believes may
> indicate that the listed chemical will be used in violation of this
> subchapter.

21 U.S.C. § 830(b)(1)(A). The statute contains no definition of "extraordinary quantity."

[6]The definition of "regulated transaction" generally allows the "Attorney General [to] establish[ ] a threshold amount for a specific listed chemical." § 802(39)(A). Section 802(39)(A)(iv)(II) provided at the time of

> The term "ordinary over-the-counter pseudoephe-drine . . . product" means any product containing pseudoephedrine . . . sold in package sizes of not more than 3.0 grams of pseudoephedrine base . . . that is packaged in blister packs, each blister containing not more than two dosage units, or where the use of blister packs is technically infeasible, that is packaged in unit dose packets or pouches.

§ 802(45)(B)(i).[7] Additionally, sales of twenty-four grams or more of pseudoephedrine were automatically subject to the recording requirements of § 830. § 802(39)(A)(iv)(II). The upshot is that over-the-counter sales of pseudoephedrine had to be recorded if the items purchased totaled twenty-four grams or more and (1) were not in blister packs or (2) were in packages of more than three grams per package.[8]

---

Kim's offense "the threshold for any sale of products containing pseudoephedrine . . . products by retail distributors or by distributors required to submit reports by section 830(b)(3) of this title shall be 24 grams of pseudoephedrine . . . in a single transaction."

At the time of the relevant transactions in this case, the Attorney General had not established single transaction thresholds for retail sales of pseudoephedrine, but he has done so since then. *Compare* 21 C.F.R. 1310.04(f) (2000) *with* 21 C.F.R. 1310.04(f) (2006). The details of the quantity or quality of pseudoephedrine that must be recorded and reported are not dispositive in this case and the statute has been amended recently, *see* infra note 8, so we do not address the recording and reporting requirements further.

[7]In the case of liquids, however, if they are "sold in package sizes of not more than 3.0 grams of pseudoephedrine base," they qualify as "ordinary over-the-counter" sales. § 802(45)(B)(ii).

[8]The federal law has very recently been amended. On March 9, 2006, President Bush signed into law an amendment to the USA PATRIOT Improvement and Reauthorization Act of 2005, which contained a section entitled the Combat Methamphetamine Epidemic Act of 2005. Pub. L. No. 109-177, § 711, 120 Stat. 192, 256-63 (2006). The Combat Methamphetamine Epidemic Act strengthened the recording requirements of the federal statute and further restricted sales of pseudoephedrine. It contains no amendment, however, to § 841(c)(2), the criminal liability section. *See id.*

California makes it a felony for people to sell certain substances "with knowledge or the intent that the recipient will use the substance to unlawfully manufacture a controlled substance." Cal. Health & Safety Code § 11104(a). The prohibited substances, which include pseudoephedrine, are listed in California Health and Safety Code section 11100(a), which also requires merchants to report sales of regulated substances.[9] The California reporting statute, section 11100, incorporates federal law by exempting from its reporting requirements those transactions involving chemicals "lawfully sold, transferred, or furnished over the counter without a prescription pursuant to the federal Food, Drug, and Cosmetic Act (21 U.S.C. Sec. 301 et seq.) or regulations adopted thereunder." CAL. HEALTH & SAFETY CODE § 11100(e)(4)(A). The California statute, however, specifically *does not exempt* from its reporting requirement sales "where the individual transaction involves more than three packages or nine grams of" pseudoephedrine. *Id.* Thus, a pharmacist who sells more than nine grams of pseudoephedrine must report the sale to the California government, whereas a pharmacist who sells less must only report the sale to California if the drugs were sold in violation of the federal law—a category which would include, as we have noted, sales made "knowing or having reasonable cause to believe" that the purchase of drugs would be used to manufacture methamphetamine.

The upshot is that neither state nor federal law specifies any "safe harbor" amount of pseudoephedrine that may be sold over the counter. Instead, the seller's actual or imputed knowledge that the chemical will be used to manufacture methamphetamine is determinative of criminal liability, regardless of the amount sold.

---

[9]"Any manufacturer, wholesaler, retailer, or other person in this state who sells, transfers, or otherwise furnishes any of the following substances to any person or business entity in this state or any other state shall submit a report to the Department of Justice of all of those transactions . . . ." CAL. HEALTH & SAFETY CODE § 11100(a).

A.  **The Interaction Between Recording and Reporting Requirements and Criminal Liability**

Kim sold quantities below the per se reporting limits of the California statute, never selling to the undercover DEA agents more than three packages or nine grams of pseudoephedrine during a single transaction. Kim argues that because the California provision makes a sale of nine grams "otherwise authorized," he did not have adequate notice that a sale of less than nine grams could subject him to federal prosecution.[10] We reject Kim's claim.

[2] *First*, Kim points to no support for his assumption that the federal statute exempts from criminal liability transactions permitted under state law. There is no provision in the federal law providing a safe harbor for transactions "otherwise authorized"; the term is entirely of Kim's own construction. Furthermore, unless a federal law states otherwise, state law cannot empower a citizen to act contrary to a federal prohibition. *See United States v. Moore*, 109 F.3d 1456, 1462 (9th Cir. 1997) (en banc).

[3] *Second*, Kim appears to have confused the reporting requirements under California law with the criminal liability standards. The California provision does not "authorize[ ]" single transactions of less than nine grams. As noted above, the California law requires merchants to report to the California Department of Justice transactions involving sales of certain chemicals. A merchant need not report a *lawful* (under federal law) sale of less than nine grams; he or she *must* report

---

[10]Kim does not challenge the sufficiency of the evidence on his conviction. In particular, he does not argue that because he did not directly participate in the January 5 transaction, he could not be guilty of distributing pseudoephedrine with any knowledge or reasonable cause to believe that this particular sale would result in the production of methamphetamine. We therefore do not decide whether a supervising pharmacist or proprietor who does not participate directly in a specific transaction can be criminally liable under § 841(c)(2).

a sale of more than nine grams, whether or not lawful under federal law.[11] The more-than-nine-grams standard is thus significant for the purposes of California law only because it delineates those sales that must automatically be reported from those that *may* not need to be reported.

**[4]** The California *felony* provision covering sales of pseudoephedrine, in contrast, contains *no* dosage safe harbor. Section 11104(a), the criminal liability provision, makes it a felony conviction to sell certain chemicals "with knowledge or the intent" that those chemicals will be used to manufacture illicit drugs. A sale of *any* quantity can violate California law if it is entered into with the requisite mental state; the quantity is irrelevant except as circumstantial evidence of intent. Although Kim allowed the undercover agents to purchase only quantities of pseudoephedrine below the per se *reporting* requirement of the California statute, he was not necessarily acting within the bounds of state law by consummating the sale for those quantities.

Kim argues that there is inadequate notice "of where (and how) the line is drawn to indicate when an [over-the-counter] sale that is otherwise authorized becomes one that is unlawful." As noted above, however, Kim's sales were *not* authorized by the California statute, although they were not explicitly prohibited either; the mens rea requirement was determinative.

*Third*, Kim's arguments based solely on federal law fare no better. He contends that because pseudoephedrine is legally sold over-the-counter for personal use, he must have protection against criminal liability under federal law for those personal use sales that are below the level at which they must be recorded. Pointing to provisions of federal law that mention "legitimate medical use" and "personal use," § 802(46)(A) &

---

[11]Additionally, a merchant must report a sale that is unlawful under federal law.

(B), Kim contends that "other than limiting the dosage level, there is nothing in the law to provide a retail distributor with assurance or guidance as to what is required for his over-the-counter sales to be deemed sales for legitimate medical use."

Kim is correct that, under federal law, a retail distributor is one who engages in sales for personal use, which are "below-threshold" sales for legitimate medical purposes. 21 U.S.C. § 802(46).[12] He forgets, however, that retail distributors are *only* exempted from the definition of "regulated transaction" (which triggers the *recording* requirements of § 830) when they sell "not more than 3.0 grams of pseudoephedrine base . . . that is packaged in blister packs, each blister containing not more than two dosage units, or where the use of blister packs is technically infeasible, that is packaged in unit dose packets or pouches." § 802(45)(B)(i).

Kim is therefore correct that a bright-line rule exists establishing a threshold for sales of pseudoephedrine.[13] This bright-line rule, however, applies only to the recording requirements and *not* to the criminal liability provision. The criminal liability provision contains no cross-reference to the recording requirements, nor does it include the terms "legitimate medical use" or "personal use." Whether the over-the-counter sale

---

[12]21 U.S.C. § 802(46) provides:

(A) The term "retail distributor" means a grocery store, general merchandise store, drug store, or other entity or person whose activities as a distributor relating to pseudoephedrine or phenyl-propanolamine products are limited almost exclusively to sales for personal use, both in number of sales and volume of sales, either directly to walk-in customers or in face-to-face transactions by direct sales.

(B) For purposes of this paragraph, sale for personal use means the sale of below-threshold quantities in a single transaction to an individual for legitimate medical use.

[13]Kim's sales to the undercover DEA agents do not fall within this exception because they involved in part over-the-counter sales of stock bottles, not solely blister packs.

was for a legitimate medical purpose within the meaning of the recording requirement is therefore technically irrelevant to the criminal liability provision at issue here. In practical terms, however, when a pharmacist knows or has reasonable cause to believe that a below-threshold quantity of pseudoephedrine will be used for the production of methamphetamine, that is not a legitimate medical use.[14]

[5] In any event, whether or not Kim had to report the sales he entered into with the undercover DEA agents to the U.S. Attorney General, he could still be subject to criminal prosecution if those sales violated § 841(c)(2). Kim's criminal liability instead turns on whether he "kn[e]w or ha[d] reasonable cause to believe" that his conduct would lead to manufacture of illicit drugs. § 841(c)(2). As is true with other criminal statutes, conduct is prohibited not solely because of its objective contours, but because of the defendant's state of mind regarding such an effect. There is no quantity threshold exempting a merchant from criminal liability under § 841(c)(2).

## B.  **Vagueness and Mens Rea**

Kim argues that, construed as containing no quantity threshold, the statute is unconstitutionally vague because it does not provide a reasonably intelligent person with sufficient notice concerning whether he is violating it. Essentially, he argues that absent designation of a "safe harbor" amount that he may sell to each individual each day, he cannot be expected to conform his behavior to legal requirements and thus avoid criminal liability. There is, however, no constitu-

---

[14]In the prior appeal from the dismissal of Kim's indictment, we determined that charging him with "reason to know that [the pseudoephedrine] would be used to make methamphetamine" was sufficient to set forth the elements of the crime. *Kim*, 298 F.3d at 750. Although a pharmacist is authorized to sell pseudoephedrine for "legitimate medical use" under 21 U.S.C. § 802(46), if the pharmacist sells the pseudoephedrine in violation of § 841(c)(2), his conduct is "not covered by the exception" of § 802(46). *Id.*

tional principle—and Kim points to none—requiring the federal government to spell out a specific amount of pseudoephedrine that pharmacists may sell in each transaction without incurring criminal liability. Nor do more general vagueness principles support his contention.

**[6]** "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Vague laws that do not infringe upon First Amendment rights have two principle evils:[15] (1) they do not give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"; and (2) they encourage arbitrary and discriminatory enforcement by not providing explicit standards for policemen, judges, and juries. *Id*. at 108-09; *accord Kolender v. Lawson*, 461 U.S. 352, 358 (1983). Thus, if a statute is not sufficiently clear to provide guidance to citizens concerning how they can avoid violating it and to provide authorities with principles governing enforcement, a defendant cannot be punished for violating that statute.

**[7]** Kim concedes, as he must, that vagueness challenges to statutes that do not involve First Amendment violations must be examined as applied to the defendant. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982); *see also United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2001) ("[O]ur concern is whether the [statute] is impermissibly vague *in the circumstances of this case*." (quoting *United States v. Ocegueda*, 564 F.2d 1363, 1365 (9th Cir. 1977) (emphasis added))). Thus, if Kim's actions clearly come within the statute, he cannot make a void for vagueness challenge. *Ocegueda*, 564 F.2d at 1365.

---

[15]Vague laws that *do* implicate First Amendment rights also have the "potential for arbitrarily suppressing First Amendment liberties." *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 91 (1965).

Kim suggests that an as-applied vagueness challenge requires only that the defendant show that his conduct, as proven at trial, was not *clearly* prohibited by the statute. This approach would, in essence, raise the usual sufficiency of the evidence standard to something akin to a clear and convincing evidence standard if a vagueness challenge is raised.

Kim seriously misinterprets the vagueness doctrine. The inquiry into whether Kim's conduct clearly falls within the statute is only a threshold inquiry, weeding out those defendants who cannot make an as-applied vagueness challenge at all. If, as here, the defendant's conduct does not fall squarely and obviously within the statute, he can make an as-applied vagueness challenge. But when the jury finds, on sufficient evidence, that he committed the statutory offense, the defendant must still demonstrate that the statute is unconstitutionally vague as applied to him to avoid conviction.[16] *See Purdy*, 264 F.3d at 811 (examining the vagueness of the statute as applied to the defendant).

**[8]** We have previously held that § 841(c)(2) contains a mens rea requirement. *United States v. Johal*, 428 F.3d 823, 827 (9th Cir. 2005). The statute "requires that a defendant subjectively know facts that either cause him or would cause a reasonable person to believe that the ingredients are being used to produce illegal drugs." *Id*. Whether a defendant is guilty of having "reasonable cause to believe" that the pseudoephedrine will be used to produce illicit drugs "turns on *the facts actually known by the defendant* in a particular case." *Id*. at 828. Also, the requirement includes the specification that the defendant had reasonable cause to believe that the chemical he sold "*will be used* to manufacture a controlled substance," § 841(c)(2) (emphasis added); mere probability of use is insufficient.[17] For all these reasons, the statutory "rea-

---

[16]As we noted earlier, we are assuming sufficient evidence because sufficiency was not challenged.

[17]*Johal* rejected the defendant's contention that the "statute requires the actual production of methamphetamine. *Johal*, 428 F.3d at 828. It is there-

sonable cause to believe" mens rea standard "limits the likelihood that a defendant will be prosecuted for mere inadvertent conduct and is consistent with the longstanding principle presuming a mens rea requirement for criminal activity." *Johal*, 428 F.3d at 827.

**[9]** The holding in *Johal* forecasts our decision here, because "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Estates*, 455 U.S. at 499. Significantly, here, a person of ordinary intelligence can base his behavior on his factual knowledge of the situation at hand and thereby avoid violating the law.

"[R]easonable cause to believe" or similar language is found in other statutes. *See Stoianoff v. Montana,* 695 F.2d 1214, 1221-22 & n.5 (9th Cir. 1983) (regarding "reasonably should know"); *see also United States v. Saffo*, 227 F.3d 1260, 1268 (10th Cir. 2000) (regarding "reasonable cause to believe"); *United States v. Biro*, 143 F.3d 1421, 1430 (11th Cir. 1998) (regarding "reason to know"). These statutes have "repeatedly withstood vagueness challenges." *Wash. Mercantile Assoc. v. Williams*, 733 F.2d 687, 692 (9th Cir. 1984). "[T]he fact that a defendant reasonably should have known something is established in substantially the same manner as actual knowledge." *Stoianoff*, 695 F.2d at 1221. "[R]easonable cause to believe" is therefore substantially similar to knowledge in eliminating vagueness. It is often *proven* largely through circumstantial evidence and inferences, but *what* must be proven is not vague.

---

fore of no consequence that Kim sold the pseudoephedrine to undercover federal agents who presumably did not actually manufacture illicit drugs with their purchases. The key question is whether *Kim* had "reasonable cause to believe the chemical will be used to make drugs." *Id.* The inquiry therefore centers on defendant's understanding, or imputed understanding, of the situation at the time of the sale.

Kim argues that larger chain stores escape liability because of their larger size and mechanized checkouts, demonstrating that the statute is subject to arbitrary enforcement and therefore vague. We do not have any evidence on the record supporting Kim's differential enforcement accusation. Even assuming that it is accurate, however, lack of prosecution of some cases that could be covered by a statute "is no sufficient reason to hold the language too ambiguous to define a criminal offense." *United States v. Petrillo*, 332 U.S. 1, 7 (1947).

Furthermore, any discrepancy in enforcement could well be the result of a structural difference between the chain stores and small pharmacies, rather than of arbitrary enforcement. It is not that the statute has no guidelines, such that the authorities can arbitrarily prosecute one class of merchants instead of another, but rather that the statute allows for a situation in which a store's structure can, intentionally or not, cause its employees and managers to avoid criminal liability. The disincentive to prosecute may be a matter of proof—that it is difficult for the government to prove the existence of an actor in the chain stores who knows or has reasonable cause to believe that a sale of pseudoephedrine will lead to the manufacture of methamphetamine, because checkout stands are covered by many different people at different times or not covered at all. Alternatively, the reason for any discrepancy in prosecution may be a matter of there not *being* an actor in the store who has such mens rea, because the larger stores have ways of monitoring their sales to assure that suspicious sales do not occur. Or it may be that the smaller, nonchain stores are targeted by the methamphetamine manufacturers themselves and so are more likely to come on the DEA's radar screen through pseudoephedrine manufacturers' reports or personal observation. As these examples show, given the reach of prosecutorial discretion, there are many explanations for differential prosecution—not all of them indicative of the most efficient policy—other than the vagueness of the statute involved.

### III. CONCLUSION

Kim has misinterpreted, whether deliberately or not, his obligations under the federal and state laws restricting the sale of pseudoephedrine. We clarify here that the recording and reporting statutes establish no safe harbor from prosecution under § 841(c)(2). Instead, retailers must refrain from selling *any* amount of pseudoephedrine knowing or having reasonable cause to believe that the buyer intends to use the chemical to manufacture methamphetamine. Here, the jury determined that Kim knew or had reasonable cause to believe that the sales to the undercover DEA agents would lead to the manufacture of methamphetamine. Kim apparently thought he could rely on some magic formula, rather than his own informed observation of his customers, to decide which sales were legal and which were not. Congress has chosen not to provide such a formula. Balancing its desire to continue to allow sales of cold medicines without a prescription against the apparent propensity of methamphetamine manufacturers to accumulate chemicals for their manufacturing processes through purchases from ordinary retail stores, Congress has placed responsibility to monitor pseudoephedrine sales on those who are profiting from them.

There may be circumstances more marginal than this one in which that approach could yield an unfair result. Careful attention to the sufficiency of the evidence in cases under § 841(c)(2) is therefore of critical importance, so as not to dissuade legitimate retailers from selling these useful home remedies at all, for fear of prosecution.[18] That Kim was acquitted

---

[18]Although he did not raise a sufficiency argument, Kim's case is somewhat close compared to others that have been reported. *See, e.g.*, *Johal*, 428 F.3d at 825-26; *Saffo*, 227 F.3d at 1263-66. There was, however sufficient evidence supporting the jury's conclusion, at least to the January 4 offense: Before the sting operation, Kim was warned by investigators from the California Pharmacy Board about the dangers of pseudoephedrine and his potential liability. There was a large spike in his sales, especially of the

by the judge and the jury on most of the counts against him indicates that such care was taken in this case.

**[10]** In sum, we conclude that because it has a sufficiently clear mens rea provision, § 841(c)(2) is not unconstitutionally vague. Kim's conviction was therefore valid.

**AFFIRMED.**

---

larger stock bottles. On January 4, Kim directly encountered three men who were acting suspiciously while purchasing substantial quantities of pseudoephedrine—specifically, stating a desire to "break it down"; purchasing alcohol, hydrogen peroxide, *and* iodine; attempting to purchase the entire supply of pseudoephedrine packages; and paying through a single person, suggesting one transaction rather than three—and yet he allowed the sale to proceed.