[Cite as *State v. Rich*, 2018-Ohio-1226.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                                    :

    Plaintiff-Appellee                       :        Appellate Case No. 27337

                                                     :

v.                                                       :        Trial Court Case No. 14-CR-3225/2

                                                     :

LISA J. RICH                                      :        (Criminal Appeal from

                                                     :         Common Pleas Court)

    Defendant-Appellant                     :

                                                     :

. . . . . . . . . .

O P I N I O N

Rendered on the 30th day of March, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

GEORGE KATCHMER, Atty. Reg. No. 005031, 1886 Brock Road NE, Bloomingburg, Ohio 43106
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1} Lisa J. Rich appeals from her conviction and sentence on one count of engaging in a pattern of corrupt activity, five counts of receiving stolen property, and one count of money laundering.

{¶ 2} Rich advances ten assignments of error. The first two challenge the legal sufficiency and manifest weight of the evidence to support her convictions for receiving stolen property. The third and fourth assignments of error challenge the legal sufficiency of the evidence to support her convictions for engaging in a pattern of corrupt activity and money laundering. The fifth assignment of error addresses the trial court's admission of "other acts" evidence, which Rich claims was irrelevant and unduly prejudicial. The sixth assignment of error challenges the constitutionality of Ohio's receiving-stolen-property statute, which Rich contends criminalizes civil negligence. The seventh assignment of error challenges the trial court's denial of her pre-trial suppression motion. The eighth assignment of error challenges the trial court's denial of her Crim.R. 29 motion. The ninth assignment of error addresses the trial court's jury instructions. In her tenth assignment of error, Rich maintains that cumulative error deprived her of a fair trial.

{¶ 3} The present appeal stems from Rich's purchase of stolen merchandise from a loosely-knit group of drug addicted "boosters" for resale on the internet and at a pawn shop she operated with her husband, co-defendant Jeffrey Rich. At trial, the State presented nine witnesses who testified that they participated in the theft of merchandise from area businesses and the sale of that merchandise to Moraine City Pawn, which was owned by Lisa Rich. The witnesses testified that they stole the merchandise and sold it to the pawn shop over a period of several months to satisfy their heroin addictions. The

stolen merchandise frequently consisted of bulk items in original packaging. Among other things, it included fishing hooks, lures and reels, tools, batteries, headphones, Nicorette gum, cosmetics and hygiene items, movies, video games, flea and tick medication and gift cards. The items came from Dick's Sporting Goods, Wal-Mart, Lowes, Home Depot, PetSmart, Sears, Kroger, Kohl's, Big Lots, and Target, as well as various dollar stores and drug stores.

{¶ 4} The nine witnesses who admitted "boosting" the items testified that they sold the stolen merchandise to Moraine City Pawn practically every day and sometimes several times a day between late 2012 and early 2013. They frequently brought the same types of items into the pawn shop multiple times a day. They usually removed security stickers or tags from the stolen merchandise before taking it to the pawn shop. If they did not, Jeffrey Rich would insist that the stickers or tags be removed and then buy the items. At trial, the witnesses identified a number of dated Moraine City Pawn "buy slips" or "tickets" bearing their names and signatures, identifying the stolen items sold, stating the price paid, and including the initials of the pawn-shop worker who entered the information into a computer. Although the witnesses typically dealt with Jeffrey Rich and negotiated with him, Lisa Rich was involved too, sometimes dealing with the customers, completing paperwork for the transactions, and re-selling stolen merchandise on eBay. Over a six-week period between December 1, 2012 and January 13, 2013, one witness, Nathan Woodard, had sixty-two buy tickets in his name. His girlfriend had thirty-five more in her name. Woodard believed it was "pretty self-explanatory" where he was getting "every day brand new stuff" he sold to the pawn shop. He also testified that if Jeffrey Rich did not know he was a drug addict, then he "weren't that bright." Another witness, Randall James

Alcorn, admitted selling "thousands" of stolen items to the pawn shop, usually carrying the items inside in large bags.

{¶ 5} Several witnesses testified that Jeffrey Rich sometimes would loan them money in the morning, enabling them to purchase heroin to start their day before engaging in retail theft. The fronted money typically then would be deducted from what the witnesses earned selling stolen items to the pawn shop later that day. One witness, Jeff Bowling, testified that Jeffrey Rich asked him to stop bringing in dollar-store batteries because they included a note on the cover asking the purchaser to contact a particular phone number if the batteries were found for sale elsewhere. Bowling testified that Jeffrey Rich also asked him to vary the use of identification cards when bringing items to the pawn shop because he did not want the same identification card used too many times. According to Bowling, Jeffrey Rich stated that if the group got caught, not to "let it come back on him."

{¶ 6} Moraine City Pawn employee Jessica Proud testified that she became suspicious about the group of individuals repeatedly selling new merchandise to the pawn shop. She was concerned because "the same kind of people were coming in continuously, bringing in the same types of items, in packages, multiples, coming in multiple times of day, the same kind of people." Proud testified that Jeffrey Rich negotiated the price and purchased most of the merchandise although Lisa Rich was involved too. According to Proud, Lisa Rich bore primary responsibility for re-selling the merchandise on the internet. In Proud's opinion, the merchandise "was obviously stolen, or obtained some way that was not legal." Proud testified that she expressed her concerns to Lisa Rich, who agreed with her. Jeffrey Rich overheard one such conversation between

Proud and his wife. He responded by telling them to mind their own business and "shut up." At one point, Jeffrey Rich also instructed Proud to stop taking pictures of the merchandise and not to be so specific about the items on buy slips or tickets she completed.

{¶ 7} In January 2013, detective Jason Neubauer visited Moraine City Pawn in connection with an investigation into the possible sale of stolen merchandise on eBay. Neubauer met with Lisa Rich and her husband on that occasion. During the meeting, Jeffrey Rich identified twenty boxes of Nicorette gum that he had purchased from Nathan Woodard. In response, Neubauer explained "that this was a sign of an obvious retail theft" as "[t]ypically thieves will target property that is small and easy to conceal, also with a high dollar amount so they get a higher return." The Riches then showed Neubauer two new Dyson vacuum cleaners and a new Generac generator. At that point, Neubauer explained to them that "thieves would target these types of property and that typically they either go directly into the store, pick the merchandise up, and walk out, or load it up into a cart and push the property out the door that way."

{¶ 8} Thereafter, in April 2013, Neubauer and other officers arranged an undercover operation at Moraine City Pawn. On that occasion, a drug addict named John Cox took twenty boxes of Prilosec into the pawn shop to sell. The boxes had been provided by Kroger. Upon seeing the boxes, Jeffrey Rich gave Cox a knife or a screwdriver and had him remove the Kroger stickers outside and then bring the boxes back inside. Cox complied, and Jeffrey Rich purchased the merchandise. During the transaction, he also asked Cox to bring "a tool or something" in with the Prilosec the next time so he could "write it up like that" and it wouldn't be recorded as "Prilosec directly."

**{¶ 9}** The following day, a second undercover operation took place. On that occasion, Cox and an undercover officer took ten boxes of Prilosec, six boxes of Crest white strips, and six boxes of a weight-loss product into Moraine City Pawn. Once again, all of the merchandise had been provided by Kroger. The officer wandered around the shop while Cox sold the merchandise to Jeffrey Rich and received payment from Lisa Rich. A third undercover operation occurred five days later. On that occasion, Jeffrey Rich came outside the pawn shop to look at two new Dyson vacuum cleaners in an undercover van. He discussed the vacuums with Cox but ultimately declined to purchase them.

**{¶ 10}** Three days later, police executed a search warrant at Moraine City Pawn. At that time, they recovered numerous items, including large quantities of new merchandise in its original packaging of the type reportedly stolen and sold to the pawn shop by the State's nine witnesses. Some of the items still had store stickers on them, and some of the items had the sellers' names associated with them. These names included some of the prosecution witnesses at trial. Approximately $3,000 worth of merchandise recovered from the pawn shop—including approximately seventy-five percent of the fish hooks—was traced to Dick's Sporting Goods. Additional stolen items were traced to CVS pharmacy. Some Crest 3D white strips still had active security tags attached.

**{¶ 11}** Lisa Rich ultimately was indicted in connection with the foregoing incidents, along with her husband. As set forth above, a jury convicted her of engaging in a pattern of corrupt activity, a first-degree felony. She also was convicted on one count of money laundering, a third-degree felony, and five misdemeanor counts of receiving stolen property. The trial court sentenced her to five years of community control and imposed a

"weekends only" 180-day jail term.

{¶ 12} In her first two assignments of error, Rich challenges the legal sufficiency and manifest weight of the evidence to support her convictions for receiving stolen property.[1] Her primary argument is that the convictions depended largely on the information contained in the buy tickets or slips about which the prosecution witnesses testified. As set forth above, those tickets, which included the witnesses' signatures, identified the stolen merchandise sold to the pawn shop on the dates contained in the indictment. Without those tickets, the witnesses lacked independent recollection of what stolen merchandise they sold to the pawn shop on any particular day. Rich argues on appeal, however, that the tickets constituted inadmissible hearsay because no one identified as a custodian of the records testified and qualified them as business records under Evid.R. 803(6). Rich also argues that the State failed to link the numerous buy tickets to specific merchandise seized from the pawn shop. Finally, Rich asserts that the prosecution witnesses were heroin addicts who had no real memories of the discrete transactions in question.

{¶ 13} When a defendant challenges the sufficiency of the evidence, she is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's

---

[1] Although Rich's first assignment of error recites six counts of receiving stolen property, we note that she was convicted and sentenced on only five counts. (Doc. #265, 273).

guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 14} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 15} With the foregoing standards in mind, we conclude that Rich's convictions for receiving stolen property are supported by legally sufficient evidence and are not against the weight of the evidence. Under R.C. 2913.51(A), the State was required to establish that Rich had received, retained, or disposed "of property of another knowing or having reasonable cause to believe that the property [had] been obtained through commission of a theft offense." Viewing the evidence in a light most favorable to the prosecution, the jury could have found the foregoing elements proven beyond a reasonable doubt. In finding Rich guilty of receiving stolen property, the jury also did not clearly lose its way and create a manifest miscarriage of justice because the evidence

does not weigh heavily against her convictions. To the contrary, the evidence overwhelmingly supports a finding that Rich received stolen merchandise from drug-addicted "boosters" while knowing or having reasonable cause to believe the property had been obtained by theft.

**{¶ 16}** Rich's argument about the pawn-shop buy tickets being inadmissible hearsay is unpersuasive for at least two reasons. First, when considering a challenge to the legal sufficiency of the evidence, we must consider all of the evidence presented at trial, regardless of whether it was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 17–20. In *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, this court extended the same principle to a manifest-weight challenge. *Id.* at ¶ 20 ("Considering all of the evidence presented at trial (including any evidence that may have been improperly admitted), the jury did not lose its way * * *."). As this court recognized in *Renner*, the prosecution is entitled to rely on the trial court's evidentiary rulings in deciding how to present its case. *Id.* at ¶ 8. That rationale applies equally to legal-sufficiency and manifest-weight challenges.[2] Therefore, contrary to Rich's argument, we are entitled to consider the challenged buy tickets when evaluating the legal sufficiency and manifest weight of the evidence.

**{¶ 17}** Second, Rich did not raise a hearsay objection to the buy tickets. She argued only that the tickets were not linked to evidence found at the pawn shop. In

---

[2] This does not mean, of course, that a defendant has no recourse when a trial court makes an evidentiary error. If the error is preserved for appeal, a defendant may raise the evidentiary issue on appeal. And if the error is deemed prejudicial, reversal may be obtained. That presents a different question, however, than whether the evidence introduced at trial is legally sufficient to support a conviction or whether a conviction is against the manifest weight of the evidence that was introduced at trial.

essence, Rich argued below that no one could say any particular merchandise seized from the pawn shop was the actual merchandise identified in the buy tickets. For example, although fish hooks from Dick's Sporting Goods were seized from the pawn shop, and prosecution witnesses testified about selling the pawn shop fish hooks stolen from Dick's Sporting Goods, the State did not prove that its witnesses stole the particular hooks found in the pawn shop when police raided it. But no such showing was required. Nothing in R.C. 2913.51(A) obligated the State to track down the exact fish hooks stolen from Dick's Sporting Goods and sold to Moraine City Pawn or to link those exact fish hooks to corresponding buy tickets. *See State v. Loch*, 10th Dist. Franklin No. 02AP-1065, 2003-Ohio-4701, ¶ 34 ("The level of proof appellant demands to demonstrate that each stolen item sold by the thieves to VIP was the same item later confiscated from VIP would be nearly impossible to obtain. The present circumstances do not lend themselves to direct proof that the items confiscated were the same items admittedly stolen and sold to VIP. Rather, due to the extremely high volume of items confiscated and stolen, many of which were the exact same make and model as each other, the present circumstances are the type that must depend upon circumstantial evidence."). In any event, this argument is not a hearsay argument, which is what Rich raises on appeal.

{¶ 18} As to the hearsay issue, we are limited to plain-error review. Courts apply the plain-error doctrine to prevent a "manifest injustice." Rich must show that but for plain error, "the outcome of [her] trial clearly would have been otherwise." *State v. Chinn*, 85 Ohio St.3d 548, 562, 709 N.E.2d 1166 (1999). We see no plain error here. Consistent with Evid.R. 803(6), the record reflects that the buy tickets were created when the pawn shop purchased the stolen merchandise, the tickets were kept by the pawn shop in the

course of business, it was the regular practice of the pawn shop to create the tickets, and the tickets were completed by the Riches or Jessica Proud, each of whom would have had actual knowledge of the transactions. Proud testified to the foregoing facts, in so many words, which may be why defense counsel did not raise a hearsay objection. (*See, e.g.*, Tr. Vol. VII at 777, 790-795). Although Proud did not refer to herself as the "custodian" of the records, she undoubtedly was at least an "other qualified witness" within the meaning of Evid.R. 803(6), which enabled her to lay a foundation establishing the tickets as business records. *See State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057, ¶ 40 ("A 'qualified witness' for this purpose would be someone with 'enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business.' "). Therefore, any hearsay objection to the buy tickets ultimately would have been futile. Proud at least arguably *did* qualify the buy tickets as business records. But even if she did not, she certainly *could have* qualified them as such if Rich had raised the issue by objecting to their admission.[3] That being so, we see no manifest injustice to support a finding of plain

---

[3]   We note that it could have been argued that some of the buy tickets do not qualify as business records because they contain inaccuracies with regard to merchandise descriptions, quantities, or other characteristics intended to conceal the pawn shop's receipt of stolen property. Under Evid.R. 803(6), such defects could show a "lack of trustworthiness" in the records. Ironically, in part, that is why the "falsified" tickets were introduced. In any event, the buy tickets qualified as non-hearsay insofar as they constituted admissions of a party-opponent under Evid.R. 801(D)(2), which covers a party's own statements, in either an individual or representative capacity, as well as statements by a party's agent or employee. Here the buy tickets bearing the initials of Jeffrey or Lisa Rich essentially constituted written admissions that on particular dates they purchased certain items from certain individuals. We believe these buy tickets could be excluded from the hearsay rule within the scope of Evid.R. 801(D)(2). *Compare United States v. Pang*, 362 F.3d 1187, 1193 (9th Cir.2004) ("The next question is whether the invoices were hearsay. They were not. When offered against Pang, Pang's invoices were admissions, and therefore non-hearsay as defined by Rule 801(d)(2).").

error.

{¶ 19} Finally, we are unpersuaded by Rich's argument about the State's key witnesses being heroin addicts who had poor memories. Although the witnesses could not recall, years later at the time of trial, what they sold the pawn shop on any particular day, they identified their signatures on dated buy tickets that listed the items they sold. They also admitted that those items would have been stolen merchandise because virtually everything they sold to Moraine City Pawn was stolen merchandise. For the foregoing reasons, Rich's convictions for receiving stolen property are based on legally sufficient evidence and are not against the manifest weight of the evidence. Her first two assignments of error are overruled.

{¶ 20} In her third assignment of error, Rich challenges the legal sufficiency of the evidence to support her conviction for engaging in a pattern of corrupt activity. Her entire argument is as follows:

> In the present matter, there is no evidence of the retail value of any of the items purportedly stolen. Nor is there any evidence of the amounts paid to the witnesses in this matter for the reasons argued in Appellant's First Assignment of Error. Nor is there any evidence as to when items testified to and sold to the Appellant were stolen. Thus, there is no evidence that ". . . the same person or persons within any one-hundred-eighty-day period . . ." stole the property in question, permitting aggregation of amounts. Thus there is no evidence that the $1,000.00 limit was reached.
>
> Nor can the items used by the CI on or after April 10, 2013 be used for aggregation. A conviction for Receiving Stolen Property requires that the

property received is, in fact, stolen. *State v. Ray*, 2010-Ohio-513, *State v. Parra*, 2011-Ohio-3977. Hearsay statements cannot be used to supply evidence that an item is stolen. *Id.* As argued by Counsel in the present matter, the items from the sales by John Cox on April 10, 2013 involved products supplied by Kroger and were not stolen from the store. As such, there can be no evidence that any stolen property was received by the Appellant on this date.

Thus, there is insufficient evidence under the R.C. 2923.31 to support a conviction under R.C. 2923.32.

(Appellant's brief at 11).

{¶ 21} Upon review, we find Rich's argument to be unpersuasive. She was convicted of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1). As relevant here, the statute required proof that Rich, while employed by or associated with an "enterprise," namely Moraine City Pawn, had participated in the affairs of the enterprise through a "pattern of corrupt activity." Under R.C. 2923.31(E), a "pattern of corrupt activity" means "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." The corrupt activity alleged by the State included money laundering and receiving stolen property, both of which are identified as corrupt activity in R.C. 2923.31(I). Under R.C. 2923.32(B)(1), the offense was a first-degree felony because one of the incidents of corrupt activity, money laundering, was a third-degree felony.

{¶ 22} In our view, the evidence is legally sufficient to support a finding that Rich

engaged in a pattern of corrupt activity. Moraine City Pawn qualified as an "enterprise," which "includes any individual, sole proprietorship, partnership, limited partnership, corporation, * * * or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." R.C. 2923.31(C). Rich does not argue otherwise. She also does not dispute that she was employed by or associated with the enterprise. Finally, the record supports a finding that she participated in the affairs of the enterprise through a pattern of corrupt activity, namely money laundering and receiving stolen property. Rich's participation in numerous acts of receiving stolen property is addressed in our analysis of her first two assignments of error above. With regard to money laundering, the State was required to prove that Rich conducted or attempted to conduct a transaction "knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with the purpose of committing or furthering the commission of corrupt activity." R.C. 1315.55(A). On appeal, Rich does not address the elements of the money-laundering charge in any detail. Regardless, the evidence supports a finding that she participated in buying stolen property from drug-addicted retail thieves or "boosters." She then conducted numerous transactions in which she re-sold the stolen merchandise in the pawn shop and on the internet with knowledge that it constituted the proceeds of theft offenses. She did so with a purpose to convert the stolen property into "clean" cash, thereby exhibiting a purpose to further the commission of her corrupt activity.

{¶ 23} Rich asserts that the evidence is legally insufficient because the State failed to prove the "retail" value of the stolen merchandise. She also claims there is no evidence establishing how much the witnesses who sold the pawn shop stolen merchandise were

paid or when these transactions occurred. It does not appear, however, that Rich raised her argument about proof of "retail value" below. In any event, the State correctly notes that it was not required to prove the retail value of the stolen merchandise. The phrase "retail value" pertains to R.C. 2923.31(I)(5)(a)(i), which defines corrupt activity as including "[o]rganized retail theft." Under R.C. 2923.31(Q), "[o]rganized retail theft" means "the theft of retail property with a retail value of one thousand dollars or more from one or more retail establishments with the intent to sell, deliver, or transfer that property to a retail property fence."

{¶ 24} The State was not required to prove a "retail" value of $1,000 or more because Rich was not charged with engaging in corrupt activity based on her committing organized retail theft. Rather, she was charged with engaging in corrupt activity based on her committing acts of money laundering and receiving stolen property. Under R.C. 2923.31(I)(2)(c), receiving stolen property constitutes "corrupt activity" when the proceeds, payments, or "value" of the property in the aggregate exceeds $1,000. As the State points out, buy tickets reflect that Nathan Woodard alone received more than $3,000 for stolen merchandise he sold to the pawn shop over a 45-day period during the relevant time. Thus, the State undoubtedly presented legally sufficient evidence to establish an aggregate "value" exceeding $1,000, regardless of the actual "retail" value of the stolen merchandise.[4]

{¶ 25} As for Rich's other arguments, the record belies her claim that there is no evidence establishing how much the witnesses who sold stolen merchandise were paid

---

[4] Even if the State had been required to prove the "retail" value of the stolen merchandise, the jury reasonably could have inferred a retail value in excess of $1,000 given that Woodard received $3,000 for items he sold to the pawn shop.

or when these transactions occurred. As set forth in our analysis of the first two assignments of error, the buy tickets established what the witnesses sold, how much they received, and when the transactions occurred. The witnesses testified about the buy tickets and made clear that they typically sold the stolen merchandise to the pawn shop almost immediately after stealing it. Finally, Rich's argument about the April 2013 undercover operation is misdirected. She contends the merchandise involved in that operation cannot be considered because it was supplied by Kroger and was not actually stolen. Assuming, arguendo, that this is true, Rich was not convicted of receiving stolen property based on the items involved in the undercover operation, and we have not considered that merchandise or its value when evaluating the legal sufficiency of the evidence to support her conviction for engaging in a pattern of corrupt activity. Accordingly, the third assignment of error is overruled.

{¶ 26} In her fourth assignment of error, Rich challenges the legal sufficiency of the evidence to support her money-laundering conviction. Her entire argument is as follows:

Appellant incorporates her argument in her Third Assignment of Error as if fully re-written herein. Due to the evidential failure to establish corrupt activity under Count 1, or in any testimony in the trial, there is a failure to establish corrupt activity under the Money Laundering statute and this conviction must be reversed.

(Appellant's brief at 12).

{¶ 27} Rich presents no new argument in support of this assignment of error, relying instead on the argument raised under her third assignment of error. Having

rejected that argument and overruled that assignment of error above, we likewise overrule the fourth assignment of error.

{¶ 28} In her fifth assignment of error, Rich contends the trial court erred in admitting "other acts" evidence that was irrelevant and unduly prejudicial. In particular, she challenges the trial court's admission of evidence concerning the prosecution witnesses' drug addiction, the cost of their drug habits, the extent of their theft activities, their sales of merchandise to Moraine City Pawn on occasions other than those specified in the indictment, and their borrowing of money from her husband to satisfy their drug habits. Rich also complains about the trial court (1) allowing the jury to see pictures of large quantities of merchandise on the sales floor at the pawn shop and in a storage area, and (2) allowing the prosecutor to present some of the physical evidence itself to the jury. She asserts that the pictures and physical evidence were irrelevant and also inadmissible under Evid.R. 403(A), and Evid.R. 404.

{¶ 29} We see no abuse of discretion in the trial court's admission of the challenged items. The fact that the prosecution's witnesses were drug addicts who regularly were stealing and selling large quantities of new merchandise to the pawn shop helped provide background and context for the charged offenses. This evidence also was relevant to the issue of Rich's knowledge that the merchandise was stolen. The extent of the witnesses' addiction explained why they sometimes brought the same types of stolen items to the pawn shop multiple times a day. The challenged evidence also was relevant insofar as it suggested that the Riches took advantage of their situation and supported their habits by loaning them money and later buying their stolen merchandise at a discount for re-sale. The fact that Jeffrey Rich loaned the witnesses money additionally

was relevant because it helped establish the extent and nature of the Riches' relationship with the witnesses, which in turn made it more likely that Lisa Rich and her husband knew what they were doing. All of the witnesses' sales of stolen merchandise to the pawn shop within the applicable time frame were relevant to the existence of a pattern of corrupt activity, regardless of whether any particular sale was the basis for a separate receiving-stolen-property charge. *See*, *e.g.*, *State v. Johnson*, 2d Dist. Darke Nos. 97 CA 1441, 97 CA 1444, 1998 WL 57796, *6 (Feb. 13, 1998) (recognizing that "uncharged conduct may be used to establish a 'pattern of corrupt activity' " because nothing in R.C. 2923.31(E) "requires a defendant to be separately indicted for, or convicted of, the underlying corrupt activity"). Finally, the pictures of large quantities of merchandise on the pawn shop's sales floor and in a storage area were relevant because the pictures were at least representative of the items that were stolen and sold to the pawn shop. To that extent, the pictures corroborated the testimony of the State's witnesses. In addition, some of the pictured items were identified as being the actual stolen merchandise. The State likewise limited its introduction of physical evidence seized from the pawn shop to items that corresponded to merchandise its witnesses testified about stealing and selling to Moraine City Pawn. We note too that the trial court gave the jury a limiting instruction concerning the pictures and physical evidence introduced at trial. (Tr. Vol. VII at 859).

{¶ 30} With regard to Evid.R. 403(A), relevant evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury." Here Rich suggests that the evidence she challenges was unfairly prejudicial or misleading. " 'Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.   Consequently, if

the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.' " *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001), quoting Weissenberger's Ohio Evidence (2000) 85-87, Section 403.3. "Because fairness is subjective, the determination whether evidence is unfairly prejudicial is left to the sound discretion of the trial court and will be overturned only if the discretion is abused." *State v. Crotts*, 104 Ohio St. 3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 25. We see no abuse of discretion here. The State's theory of the case was that the Riches knowingly relied on a group of drug-addicted "boosters" to supply them with stolen merchandise, which they re-sold for a profit through the pawn shop. All of the challenged evidence was tied to this theory, and the trial court had discretion to conclude that it was not misleading and that its probative value was not substantially outweighed by the danger of unfair prejudice.

{¶ 31} We also reject Rich's reliance on Evid.R. 404(B), which provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rich's complaint about "other acts" evidence is directed toward the prosecution witnesses' testimony about their drug use and their uncharged thefts and sales of stolen merchandise to Moraine City Pawn. However, the witnesses' drug use went to their motive for committing the thefts. It also formed part of the immediate background of the crimes charged in the indictment. *See State v. Morris*,

132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 13. Additionally, evidence about numerous sales of stolen merchandise to the pawn shop helped establish a pattern of corrupt activity, regardless of whether each incident formed the basis for a separate charge of receiving stolen property. That being so, the evidence was an integral part of the State's proof of the charge of engaging in a pattern of corrupt activity, not "other acts" evidence. In addition, evidence that the pawn shop regularly bought large quantities of the same types of stolen merchandise from the same group of drug-addicted thieves helped establish the Riches' knowledge that the merchandise was stolen and their lack of mistake or accident in buying stolen goods. For each of the foregoing reasons, the trial court did not abuse its discretion in failing to exclude the challenged evidence under Evid.R. 404(B). The fifth assignment of error is overruled.

{¶ 32} In her sixth assignment of error, Rich challenges the constitutionality of Ohio's receiving-stolen-property statute, which she contends criminalizes civil negligence. The statute, R.C. 2913.51(A), provides that "[n]o person shall receive, retain, or dispose of property of another knowing or *having reasonable cause to believe* that the property has been obtained through commission of a theft offense." (Emphasis added). Rich asserts that the statute's "reasonable cause to believe" language unconstitutionally criminalizes civil negligence.

{¶ 33} Upon review, we find Rich's argument to be unpersuasive. Other Ohio appellate courts have addressed and rejected the same argument. *See, e.g.*, *State v. York*, 8th Dist. Cuyahoga No. 49952, 1985 WL 8502, *4 (Oct. 24, 1985); *State v. Skorvanek*, 9th Dist. Wayne No. 2545, 1990 WL 94226, *2 (June 27, 1990); *State v. Miller*, 4th Dist. Pickaway No. 82 CA 24, 1984 WL 4270, *2-3 (March 6, 1984). We now join

them.[5] The receiving-stolen-property statute includes a culpable mental state of "knowing or having reasonable cause to believe." We agree with the Fourth District that "having reasonable cause to believe" is essentially "a refinement of the knowledge state of culpability." *Miller* at *3; *see also United States v. Jae Gab Kim*, 449 F.3d 933, 943 (9th Cir.2006) (recognizing that "reasonable cause to believe" is "substantially similar to knowledge" and that "[i]t is often proven largely through circumstantial evidence and inferences").

**{¶ 34}** In arguing to the contrary, Rich suggests the statute's reference to "reasonable cause" implies a wholly-objective "reasonable man" standard, leaving open the possibility of a conviction based on simple negligence. But the statute's mens rea requirement fairly may be read to have a subjective component insofar as it requires the offender himself or herself to *know* or to *have* reasonable cause to believe the property at issue was stolen. *Compare United States v. Saffo*, 227 F.3d 1260, 1268-1269 (10th Cir.2000) ("[W]e hold that the 'knowing or having reasonable cause to believe' standard in 21 U.S.C. §841(d)(2) imposes a constitutionally sufficient mens rea requirement. In so holding, we note that the standard involves a subjective inquiry that looks to whether the particular defendant accused of the crime knew or had reasonable cause to believe the listed chemical would be used to manufacture a controlled substance. This requires scienter to be evaluated through the lens of this particular defendant, rather than from the prospective of a hypothetical reasonable man. In this context, the 'reasonable cause to

---

[5] In *State v. Emmons*, 57 Ohio App.2d 173, 386 N.E.2d 838 (2d Dist.1978), this court held that the "having reasonable cause to believe" language in R.C. 2913.51 was not unconstitutionally vague. In *Emmons*, this court did not address whether the statute unlawfully criminalizes civil negligence.

believe' standard is one akin to actual knowledge."); *United States v. Johal*, 428 F.3d 823, 827-828 (9th Cir.2005) ("[W]e hold that 'reasonable cause to believe,' in the context of §841(c)(2), requires that a defendant subjectively know facts that either cause him or would cause a reasonable person to believe that the ingredients are being used to produce illegal drugs. This standard limits the likelihood that a defendant will be prosecuted for mere inadvertent conduct and is consistent with the longstanding principle presuming a mens rea requirement for criminal activity. * * * [R]easonable cause to believe is not purely objective, but turns on the facts actually known by the defendant in a particular case—facts from which the jury can infer that any reasonable person in the defendant's position would have had to know that the ingredients were being bought to make illegal drugs. As a practical matter, therefore, the differences between actual and constructive 'knowledge' under the statute are not substantial.").

{¶ 35} With regard to Ohio's receiving-stolen-property statute, we note too that "[i]f the legislature had omitted 'reasonable' and had defined this element as 'knowing or having cause to believe' the property was stolen, the courts undoubtedly would have construed it to mean 'reasonable cause,' following our long-established tradition of fairness in the application of criminal law." *State v. Bentz*, 2 Ohio App.3d 352, 353, 442 N.E.2d 90 (1st Dist.1981). Finally, we note that "reasonable cause to believe" language, or similar terminology, is found in many statutes and has been upheld many times, including by the United States Supreme Court. *See, e.g.*, *Gorin v. United States*, 312 U.S. 19, 27-28, 61 S.Ct. 429, 85 L.Ed.2d 488 (1941) ("The obvious delimiting words in the statute are those requiring 'intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation.'

This requires those prosecuted to have acted in bad faith. The sanctions apply only when scienter is established. * * * The language employed appears sufficiently definite to apprise the public of prohibited activities and is consonant with due process."); *Jae Gab Kim* at 943 (citing cases and observing that "reasonable cause to believe" or analogous language "is found in other statutes").

{¶ 36} In arguing that the "reasonable cause to believe" standard unconstitutionally imposes criminal liability for civil negligence, Rich relies exclusively on *Elonis v. United States*, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015). In that case, the defendant was convicted under 18 U.S.C. 875(c), which prohibits transmitting a communication containing a threat to kidnap or injure another person. The statute does not specify any mental state with respect to any of its elements. The issue was what mental state, if any, should be read into the statute regarding the fact that a communication contains a threat. At trial, the judge had instructed the jury that a statement is a threat "when a defendant intentionally makes a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual." *Id.* at 2007. On review, the Supreme Court reversed the defendant's conviction because it "was premised solely on how his [internet] posts would be understood by a reasonable person." *Id.* at 2011. The majority opined that having guilt turn on whether a "reasonable person" perceives a communication as a threat, regardless of what the defendant subjectively thinks, reduces culpability to negligence. *Id.* It expressed reluctance to infer that a negligence standard was intended in a criminal statute. *Id.* The majority then read a mental-state requirement into the statute

and held that it would be satisfied if the defendant transmitted a communication "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id.* at 2012.

{¶ 37} Upon review, we find Rich's reliance on *Elonis* to be misplaced for at least two reasons. First, *Elonis* involved statutory interpretation, whereas Rich argues that criminalizing simple negligence violates the Constitution, which is something *Elonis* did not address. The Supreme Court simply declined to infer that Congress had intended a negligence standard to apply and, instead, read purpose or knowledge into the federal statute. Second, the *Elonis* majority reasoned that the trial court had applied a negligence standard by focusing exclusively on whether a hypothetical "reasonable person" would have perceived the defendant's communications as threats. Unlike the jury instruction in *Elonis*, however, R.C. 2913.51(A) includes a culpable mental state requiring the defendant herself to know or to have reasonable cause to believe the property at issue is stolen. As we have explained, this standard has a subjective component that requires examining the facts from the perspective of the defendant, not just from the perspective of a hypothetical "reasonable person." That being so, we conclude that "having reasonable cause to believe" is substantially similar to knowledge. Consequently, we find *Elonis* to be distinguishable. The sixth assignment of error is overruled.

{¶ 38} In her seventh assignment of error, Rich challenges the trial court's denial of her pre-trial suppression motion. In particular, she contends a search-warrant affidavit failed to establish the reliability of sources relied on by investigators. She also asserts that the affidavit failed to establish probable cause that she was buying and re-selling stolen merchandise. She notes that referenced items from a Kroger store involved in

undercover transactions were not actually stolen. Finally, Rich claims the search warrant was so generalized that it permitted seizure of virtually anything.

{¶ 39} "In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

{¶ 40} "In reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a de novo determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant." *Id.* at paragraph two of the syllabus. "Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *Id.*

{¶ 41} In the present case, police actually obtained two warrants, one in April 2013 and one in May 2013, both based on affidavits from Moraine detective Jason Neubauer. As relevant here, the April 2013 affidavit sought a warrant to search Moraine City Pawn

for evidence related to receiving stolen property in violation of R.C. 2913.51, improper maintenance of pawn and purchase forms in violation of R.C. 4727.08, and engaging in prohibited transactions in violation of R.C. 4727.10.[6]

{¶ 42} In paragraph two of his affidavit, Neubauer averred that detective Bryan Sears from Centerville informed him in January 2013 about an investigation concerning the theft of baseball gloves from Play-It-Again Sports. Sears had discovered that the stolen gloves were being sold on eBay by Lisa Rich. According to Neubauer, Lisa Rich later confirmed buying the gloves at the pawn shop and selling them on eBay. Sears also informed Neubauer that the Riches were "selling other suspicious retail items such as Nicorette Gum and Dyson Vacuums."

{¶ 43} In paragraph three of his affidavit, Neubauer averred that he spoke with the Riches at Moraine City Pawn on January 16, 2013. While there, the Riches showed him approximately twenty boxes of Nicorette gum they had purchased from Nathan Woodard. Neubauer also observed two new Dyson vacuums and a new generator that the Riches had purchased from Michael Elam. Neubauer warned the Riches not to buy new retail merchandise, particularly high-end items, because of the likelihood that such merchandise might be stolen.

{¶ 44} In paragraph four of his affidavit, Neubauer averred that on March 29, 2013 detective Mark Brown from Beavercreek advised him about an investigation of retail thefts from Dick's Sporting Goods by a suspect named Herlon Curtis. Brown told Neubauer that Curtis was stealing "Hummingbird Fishfinders, Cuddeback Ambush Game Cameras, and

---

[6] Violations of the latter two statutes are third-degree misdemeanors on the first offense and second-degree misdemeanors thereafter. R.C. 4727.99.

Gamakatsu fish hooks" and selling these to Moraine City Pawn. Neubauer then searched the Riches' eBay account, which was in Lisa Rich's name and used the pawn shop's phone number. The account had a "substantial transaction history" that included selling Hummingbird Fishfinders, Cuddeback Ambush Game Cameras, and Gamakatsu fish hooks, as well as other items including "Nicorette Gum, Osteo Bi-Flex Glucosamine Chondroitin, Engerizer batteries, Venus Vibrance Razors, Dyson Vaccuums, Olay products, and Crest White Strips."

{¶ 45} In paragraph five of his affidavit, Neubauer averred that he visited Moraine City Pawn on April 1, 2013. During that visit, he observed a large box full of Crest white strips. He also discovered that Jeffrey Rich had purchased a Home Depot gift card from a person named Tyler Wise, who Neubauer knew from a prior investigation was selling stolen gift cards. Wise previously had been "flagged" and identified to Jeffrey Rich as someone who was selling stolen property and whose business should be refused by the pawn shop. Neubauer also noticed that the pawn shop's buy tickets lacked serial numbers for property and did not include the amount paid.

{¶ 46} In paragraph six of his affidavit, Neubauer described an April 2, 2013 meeting in which he and other detectives discussed eight Middletown residents selling stolen merchandise to Moraine City Pawn. Detective Jon Rawlins stated that Jeffrey Rich was giving suspects a list of items he wanted to purchase. According to Rawlins, one of the suspects had admitted selling stolen items to the pawn shop and had said Jeffrey Rich was recording the transactions under other people's names.

{¶ 47} In paragraph seven of his affidavit, Neubauer described obtaining twenty marked boxes of Prilosec OTC from Kroger on April 10, 2013 for use in an undercover

operation. Each box included a sticker that advised purchasers to contact a certain phone number if the box was found for sale elsewhere. Neubauer showed the boxes to a confidential informant (CI) who predicted that Jeffrey Rich would buy the boxes for seven or eight dollars each but would require the stickers to be removed. While wearing a recording device, the CI then took the boxes into the pawn shop. Upon seeing the boxes, Rich gave the CI a knife and told him to go outside and remove the stickers. After the CI complied, Jeffrey Rich purchased the boxes for eight dollars each. During the incident, he also inquired about Herlon Curtis, who was known to Neubauer to be stealing large quantities of retail merchandise. Jeffrey Rich proceeded to say that he had told Curtis a Miami Township police officer had been in the pawn shop looking for him. Jeffrey Rich also told the CI that Curtis had a "hold" on him and that Jeffrey Rich could not do business with Curtis any more. When talking about Curtis, Rich added: "He ain't like one of these little boosters that come in with a whole bunch of cheap" merchandise. With regard to the Prilosec OTC purchase, Jeffrey Rich advised the CI to bring some kind of tool with it the next time so he could mention a tool when writing up the buy ticket. He also suggested another pawn shop for the CI to sell to "every other time." Jeffrey Rich told the CI to tell Curtis about the other pawn shop too because he could not see Curtis much.

{¶ 48} In paragraph eight of his affidavit, Neubauer averred that he accessed "Leads Online" on April 11, 2013 and located a buy ticket for Jeffrey Rich's Prilosec OTC transaction with the CI. The ticket failed to list an identification number for the CI. It described the item as "Prilosec Household" and failed to include a quantity, the purchase price, or a picture.

{¶ 49} In paragraph nine of his affidavit, Neubauer described a second undercover

operation at Moraine City Pawn. During this operation, which occurred on April 11, 2013, Neubauer obtained from Kroger multiple marked boxes of Prilosec OTC, Crest white strips, and Alli weight-loss capsules. The total retail value of these items exceeded $1,000. Before giving the items to the CI, Neubauer removed the stickers described above. Again, the CI wore a recording device and took the items into the pawn shop. Upon seeing a large box of Alli, Jeffrey Rich stated that he was "gonna have a hard time with that." They also discussed Dyson vacuum cleaners. They then proceeded to negotiate a total purchase price of $188, and Lisa Rich completed the transaction with the CI.

{¶ 50} In paragraph ten of his affidavit, Neubauer averred that he accessed "Leads Online" on April 16, 2013 and located a buy ticket for the second undercover transaction. The clerk was listed as Lisa Rich. The ticket did not include an identification number for the CI. It described the merchandise as "Household; Alli Crest Prilosec." It did not include the quantity, the purchase price, or a picture.

{¶ 51} In paragraph eleven of his affidavit, Neubauer averred that on April 16, 2013 he obtained two Dyson vacuum cleaners from Kroger for use in another undercover operation. On that occasion, the CI wore a recording device and took the vacuum cleaners to Moraine City Pawn. The CI discussed the vacuums with Jeffrey Rich, who stated that he could not take any more. Jeffrey Rich added that "[t]hey're coming down pretty hard." He also stated that he had not heard anything about the CI. Jeffrey Rich then made a couple of phone calls for the CI in an unsuccessful attempt to find a buyer for the vacuums. After the CI left, Jeffrey Rich called Neubauer and left a message for the detective to call him.

**{¶ 52}** In paragraph twelve of his affidavit, Neubauer averred that he searched Lisa Rich's eBay account and found 119 listings, including listings for Prilosec, Crest white strips, Alli, Gamakatsu fish hooks, and a "Wildgame" game camera. Neubauer suspected that these items were stolen.

**{¶ 53}** In paragraph thirteen of his affidavit, Neubauer averred that he returned Jeffrey Rich's phone call. Jeffrey Rich told the detective about a person trying to sell him two new Dyson vacuum cleaners. Jeffrey Rich said the items made him suspicious and he thought the detective should know. Rich added that he "owed" the detective one, and he would let the detective "have this one."

**{¶ 54}** In paragraph fourteen, Neubauer averred that, based on his training and experience, "the actions of the occupants at Moraine City Pawn * * * are consistent with individuals buying and selling stolen goods."

**{¶ 55}** The proposed search warrant provided by Neubauer identified the following items as being subject to seizure from Moraine City Pawn:

1. Stolen property, including but not limited to: personal care/hygiene products, cameras, sporting equipment, tools, electronic equipment, vacuums, and other items commonly associated with large scale retail theft organized crime.

2. Any surveillance equipment including but not limited to: digital video recorders, computers, and monitors and the contents of these devices.

3. Currency of any type or other items of value.

4. Personal papers, documents, books, financial records, e-Bay

records, purchase and pawn slips, computers and related computer hardware and software all of which are believed to be derived from or instrumental in purchasing and selling stolen goods.

5. Firearms and ammunition, including but not limited to guns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, and any and all records pertaining to firearms and ammunition.

[6.] Paper documents or utility records indicating the ownership or occupancy of said premises.

[7.] Labels, identifiable stickers, or documentation indicating the original owner of property.

[8.] Further photograph, fingerprint, buccal swab, at the scene, any adult subjects found inside the premises for the purpose of comparison to any evidence found at the scene.

{¶ 56} Upon review, we conclude that Neubauer's affidavit supplied the issuing judge with a more-than-sufficient basis for finding a fair probability that stolen merchandise would be discovered inside the pawn shop. Although Neubauer provided little detail with regard to the veracity of some of his sources or his basis of knowledge with regard to some of his averments, other averments were sufficiently supported. We note too that the affidavit mentions Lisa Rich admittedly selling stolen baseball gloves on eBay and Jeffrey Rich buying a gift card from someone who previously had been identified to him as a known thief. In addition, Jeffrey Rich's recorded interactions with the CI provided strong evidence to support a finding of probable cause with regard to the Riches' involvement in receiving stolen property. Jeffrey Rich's words and actions supported a

reasonable inference that he believed he was purchasing stolen property. Although the items from Kroger were not actually stolen, Jeffrey Rich did not know that fact. His interactions with the CI demonstrated his willingness to purchase merchandise that he believed was stolen, thereby supporting a finding, particularly when viewed in the context of the rest of the affidavit, that stolen property likely would be found inside the pawn shop. In addition, some of Jeffrey Rich's comments to the CI were themselves indicative of the pawn shop's involvement in criminal activity and suggested that he knowingly had been purchasing stolen merchandise. In short, after considering Neubauer's affidavit in its entirety, we see no basis for rejecting the issuing judge's probable-cause determination.

{¶ 57} Rich also argues that the search warrant was defective because it was so generalized that it permitted seizure of virtually anything. Upon review, we agree that portions of the warrant, particularly when read in isolation, were general. For example, the warrant authorized seizure of currency or "any other item of value." It also authorized seizure of "items commonly associated with large scale retail theft organized crime." Interpreted literally, these examples would permit the seizure of just about anything. In addition to being broad and general, the second example provides no guidance with regard to what constitutes an item associated with large scale retail theft (other than the specific examples that precede this language). We note too that the warrant authorized seizure of items seemingly unrelated to the information in Neubauer's affidavit. For example, the affidavit provided no information about theft of firearms. Yet the warrant authorized seizure of all types of firearms and weapons. And inventory receipts reflect that several firearms were seized.

{¶ 58} We nevertheless conclude that any shortcoming in the warrant's description

of items to be seized does not justify reversal. In addition to containing some generalized language, the warrant also specifically authorized seizure of items that were related to Neubauer's affidavit and his investigation into the pawn shop receiving stolen property. Among other things, the warrant specifically authorized seizure of personal care/hygiene items, cameras, sporting equipment, tools, electronic equipment, and vacuums. These are the types of items involved in Neubauer's investigation. In addition, the warrant specifically authorized seizure of computers and records that reasonably may have been involved in the Riches' buying and selling of stolen merchandise. It also specifically authorized seizure of labels, stickers, and documents indicating ownership of the property at issue.

{¶ 59} Having reviewed the trial transcripts, we fail to see how Rich was prejudiced by the fact police acted pursuant to a warrant that included some general language and that authorized seizure of some items that perhaps were irrelevant to the charges against her. Rich was not convicted based on the prosecutor presenting the jury with firearms seized from the pawn shop, currency, or random "item[s] of value."[7] Rather, she was convicted based on the testimony of numerous prosecution witnesses who admitted stealing new merchandise from area businesses and selling it to Rich and her husband under circumstances that made it virtually impossible for the Riches not to have known the merchandise was stolen. The witnesses' testimony was corroborated by buy tickets, pictures of merchandise, and actual physical merchandise that was illustrative of, if not

---

[7] Although the State presented boxes of property seized from the pawn shop at trial, the prosecutor was careful to display only those items that corresponded with the types of merchandise about which the government's witnesses previously had testified. (*See* Tr. Vol. VII at 851, 892-922).

identical to, the items they sold to the pawn shop. The buy tickets and these pertinent items properly were seized pursuant to the warrant, which described them with sufficient particularity. Rich simply has not shown how she was prejudiced by the fact that the warrant also enabled police to seize some extraneous items.

{¶ 60} With regard to the second search warrant, which was issued in May 2013, the record reflects that it pertained solely to the contents of computers and thumb drives seized from Moraine City Pawn during execution of the first search warrant. In his affidavit in support of the second search warrant, Neubauer averred that the Riches had admitted using eBay to sell items they purchased at the pawn shop. Neubauer also averred that Lisa Rich had told him she kept business records on a pawn shop computer. In addition, Neubauer stated that Jeffrey Rich had told him the pawn shop used a computerized surveillance system that included audio and video files, which potentially might have documented criminal transactions. Finally, the requested search warrant specifically identified the pertinent computer central processing units and thumb drives by serial number. Having reviewed Neubauer's affidavit and the second search warrant, we again see no basis for rejecting the issuing judge's probable-cause determination.[8] For the foregoing reasons, we overrule the seventh assignment of error.

{¶ 61} In her eighth assignment of error, Rich challenges the trial court's denial of her Crim.R. 29 motion. She raises three issues. First, she cryptically asserts "that money laundering cannot be a predicate for money laundering." Second, she cites an unspecified "conflict in men [sic] rea between the money laundering and receiving statutes which can

---

[8] Parenthetically, we note too that the State represented below and in its appellate brief that no evidence obtained from the second search warrant was used at trial. (Appellee's brief at 57; Tr. Vol. VII at 850). Rich has not disputed this assertion.

lead to an unclear verdict." Third, she insists "there was no evidence that any of the items were actually stolen."

**{¶ 62}** Upon review, we find no error in the trial court's denial of Rich's Crim.R. 29 motion. Rich's argument about money laundering being a predicate for money laundering includes a transcript citation and a reference to *State v. Pugh*, 9th Dist. Summit No. 24905, 2010-Ohio-2741. On the cited transcript page, defense counsel actually argued that a money-laundering conviction could not be predicated solely on receiving stolen property. (Tr. Vol. IX at 1170-1171). In support, counsel cited *Pugh*. The Ninth District observed in *Pugh* that "[t]he act of transacting money alone does not amount to money laundering." *Pugh* at ¶ 13. Although the appellant had transferred certain funds into her own account, the Ninth District found no evidence that she did so with the purpose to promote, manage, establish, or carry on a "corrupt activity" as required for a money-laundering conviction under R.C. 1315.55(A)(3). *Id*. With one judge dissenting, the Ninth District rejected the State's argument that the appellant transferred the money with the purpose to promote, manage, establish or carry out the "corrupt activity" of money laundering. The majority rejected the State's "cyclical argument that it proved Pugh laundered money by proving that she laundered money." *Id*. at ¶ 15. The majority opined that the State could not "rely upon money laundering as the basis for a corrupt activity with regard to a single transaction or the first of multiple transactions." *Id*.

**{¶ 63}** Regardless of the merits of the Ninth District's decision, we find it to be distinguishable. As an initial matter, Rich was convicted of money laundering under R.C. 1315.55(A)(1), not R.C. 1315.55(A)(3). The two subdivisions criminalize substantially different conduct, limiting the relevance of *Pugh*. As set forth above, R.C. 1315.55(A)(1)

provides: "No person shall conduct or attempt to conduct a transaction knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with the purpose of committing or furthering the commission of corrupt activity." Here Rich conducted transactions involving re-selling stolen merchandise with knowledge that the merchandise represented the proceeds of theft offenses. The jury reasonably could have found that she did so with the purpose of furthering the commission of corrupt activity by converting the stolen property into untraceable cash. Unlike *Pugh*, the present case did not involve using money laundering to prove money laundering. At most, the State used Rich's commission of the offense of receiving stolen property to help prove the offense of money laundering. We see no error and no conflict with *Pugh*. *Compare State v. Clayton*, 2d Dist. Montgomery No. 22937, 2009-Ohio-7040, ¶ 31-33 (holding that the appellant engaged in money laundering in violation of R.C. 1315.55(A)(1) by stealing funds from escrow accounts and then transferring the money into a business operating account for his own benefit).

{¶ 64} Rich's other two arguments are even less persuasive. She cites a "conflict" between the mens rea in the statutes defining the offenses of money laundering and receiving stolen property. She suggests that this conflict "can lead to an unclear verdict." As set forth above, the money-laundering statute, R.C. 1315.55(A)(1), prohibits conducting a transaction while knowing that the property involved is the proceeds of unlawful activity and with the purpose of committing or furthering corrupt activity. The receiving-stolen-property statute, R.C. 2913.51(A), requires an offender to know or have reasonable cause to believe that the property has been obtained through commission of a theft offense. Rich fails to explain how the fact that these statutes are worded differently

obligated the trial court to grant her relief under Crim.R. 29, which addresses the sufficiency of the State's evidence to sustain a conviction.

{¶ 65} Finally, Rich asserts that she was entitled to relief under Crim.R. 29 because "there was no evidence that any of the items were actually stolen." As we explained in our analysis of her first two assignments of error, however, the record contains legally sufficient evidence to support a finding that Rich participated in purchasing and re-selling stolen merchandise from drug-addicted thieves while knowing or having reasonable cause to believe the property had been obtained through theft. This conclusion is supported by the buy tickets discussed above and testimony from numerous prosecution witnesses who admitted stealing merchandise and selling it to the Riches under circumstances indicating that the Riches knew or had reasonable cause to believe the merchandise was stolen. Accordingly, the eighth assignment of error is overruled.

{¶ 66} In her ninth assignment of error, Rich addresses the trial court's jury instructions. She presents the following one-sentence argument: "Objections were raised as to the defining of receiving stolen property as corrupt activity in itself and to using the phrase 'reasonable cause to believe' which is not statutorily defined and utilizes a civil negligence standard as argued above."

{¶ 67} This assignment of error lacks merit. In the proceedings below, defense counsel objected to the trial court instructing the jury that the offense of receiving stolen property qualifies as "corrupt activity." Defense counsel specifically argued that receiving stolen property qualifies as "corrupt activity" only if it is accompanied by money laundering. (Tr. Vol. IX at 1214). Standing alone, defense counsel asserted that receiving stolen property does not constitute "corrupt activity." (*Id.* at 1216-1217). The trial court

disagreed. (*Id.* at 1219). It later instructed the jury "as a matter of law that receiving stolen property is a corrupt activity." (*Id.* at 1294). We see no error in the trial court's rejection of defense counsel's argument. The offense of receiving stolen property in violation of R.C. 2913.51 explicitly is identified as "corrupt activity" under R.C. 2923.31(I)(2)(c).[9] *See State v. Pennington*, 12th Dist. Preble No. CA93-03-006, 1993 WL 414191, *2 (Oct. 18, 1993) ("Receiving stolen property is a violation of R.C. 2913.51, and it is specifically defined as a corrupt activity.").

**{¶ 68}** We also reject Rich's challenge to the jury instruction about having "reasonable cause to believe." Defense counsel objected to this instruction, which related to the receiving-stolen-property counts. As set forth above, the State was required to prove that Rich had obtained the merchandise at issue knowing or having reasonable cause to believe it had been obtained through the commission of a theft offense. Defense counsel argued that "reasonable cause to believe" as a mens rea was not statutorily defined and, therefore, should not be defined by the trial court. (Tr. Vol. IX at 1220). The trial court overruled the objection. (*Id.*). When addressing the charges against Jeffrey Rich, it then gave the jury the following instruction, which tracks OJI section 513.51(4):

---

[9] Although R.C. 2923.31(I)(2)(c) is not a model of clarity, it appears that the only limitation on receiving stolen property qualifying as "corrupt activity" is that the value of the property at issue in any violation or combination of violations must exceed $1,000. In neither her Crim.R. 29 motion nor her objections to the jury instructions, however, did Rich raise the $1,000 threshold as an issue or argue that it had not been met. While the trial court's jury instructions did not specify that receiving stolen property qualifies as "corrupt activity" only if the value of the property exceeds $1,000, that omission is not the basis of Rich's assignment of error either. In any event, because she failed to raise that particular objection below, we would be limited to plain-error review. We would not find plain error here because the stolen merchandise unquestionably was worth much more than $1,000. Therefore, but for the trial court's omission the outcome would not have been otherwise. To the contrary, if Rich had objected, the trial court simply could have added language addressing the value of the property, and the result would have been the same.

In determining whether the Defendant Jeffrey Rich had reasonable cause to believe that the property had been obtained though the commission of a theft offense, you must put yourself in the position of the Defendant with his knowledge or lack of knowledge and under the circumstances and conditions that surrounded him at that time.

You must consider the conduct of the persons involved and determine whether their acts and words and all the surrounding circumstances would have caused a person of ordinary prudence and care to believe that the property was obtained through the commission of a theft offense. * * *

(Tr. Vol. IX at 1297).

**{¶ 69}** We see no error in the foregoing instruction, which the trial court also applied to the charges against Lisa Rich.[10] The first paragraph correctly instructed the jury to place itself in the defendant's position with the information known to him (or her) to determine whether he (or she) personally had reasonable cause to believe the property at issue was stolen. The second paragraph assisted the jury in determining whether the personal, subjective belief the defendant had about the nature of the property was a reasonable one. Taken together, the two paragraphs correctly conveyed the point that "reasonable cause to believe" was not purely objective insofar as it depended on facts actually known to the defendant and a belief personal to him (or her) from which the jury

---

[10] After defining "reasonable cause to believe" in connection with the charges against Jeffrey Rich, the trial court turned to the charges against Lisa Rich. With regard to the meaning of "reasonable cause to believe," the trial court stated: "Reasonable cause to believe has previously been defined for you and has the same meaning as above." (Tr. Vol. IV at 1303-1304).

also could infer that any reasonable person in the defendant's position would have known the property was stolen. Finally, we note that the trial court's instruction about having "reasonable cause to believe" has been upheld by other Ohio appellate courts as well. *See, e.g., State v. Gimenez*, 8th Dist. Cuyahoga No. 71190, 1997 WL 547950, *9 (Sept. 4, 1997) ("Appellant contends that the trial court's instruction, as taken from 4 Ohio Jury Instructions (1994), Section 513.51(4), improperly transformed the crime of receiving stolen property into one requiring a mere showing of negligence on the part of appellant. This court and other Ohio courts have specifically sanctioned the constitutionality, specificity and clarity of complained-of instructions relating to the element of 'reasonable cause to believe.' "); *State v. Overholt*, 9th Dist. Medina No. 02CA0108-M, 2003-Ohio-3500, ¶ 17-18 (citing cases and holding that the OJI "definition of 'reasonable cause' properly explains the term for purposes of R.C. 2913.51"). Having found nothing objectionable about the challenged instruction, we overrule the ninth assignment of error.

{¶ 70} In her tenth assignment of error, Rich maintains that "cumulative error" deprived her of a fair trial. She asserts that several of the alleged errors she addressed above, even if individually harmless, constitute prejudicial error when aggregated.

{¶ 71} It is true that separately harmless errors may violate a defendant's right to a fair trial when the errors are aggregated. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). To find cumulative error, we first must find multiple errors committed at trial. *Id.* at 398. We then must find a reasonable probability that the outcome below would have been different but for the combination of separately harmless errors. *State v. Thomas*, 2d Dist. Clark No. 2000-CA-43, 2001 WL 1103328, *9 (Sept. 21, 2001). Here, however, we have not found multiple instances of separately harmless error. That being

so, we have nothing to aggregate. The tenth assignment of error is overruled.

{¶ 72} Based on the reasoning set forth above, we affirm the judgment of the Montgomery County Common Pleas Court.

. . . . . . . . . . . . .

WELBAUM, P. J. and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck
Heather N. Jans
George Katchmer
Hon. Michael W. Krumholtz